422 A.2d 611

**Charles S. YAINDL, Appellant,**

v.

**INGERSOLL–RAND COMPANY STANDARD PUMP–ALDRICH DIVISION.**

Superior Court of Pennsylvania.

Argued March 11, 1980.

Filed Oct. 31, 1980.

Petition for Allowance of Appeal Denied Jan. 27, 1981.

562

564

Paul A. McGinley, Allentown, for appellant.

William H. Fitzgerald, Allentown, for appellee.

Before SPAETH, BROSKY and VAN der VOORT, JJ.

SPAETH, Judge:

This is an appeal from an order granting summary judgment in a trespass action. The issue is what remedies may be available to an employee–at–will who has been discharged by his employer.

I

The principles to be applied in deciding whether to grant a motion for summary judgment are settled:

"Summary judgment is made available by Pa.R.C.P. 1035, 12 P.S. Appendix when the pleadings, depositions answers to interrogatories, admissions on file and supporting affidavits considered together reveal no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. This severe disposition should only be granted in cases where the right is clear and free from doubt. To determine the absence of genuine issue of fact, the court must take the view of the evidence most favorable to the non–moving party, and any doubts must be resolved against the entry of the judgment." (Citations omitted). *Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 458, 341 A.2d 174, 177 (1975). *See also Amabile v. Auto Kleen Car Wash*, [249] Pa.Super. [240], 376 A.2d 247 (Filed June 29, 1977); *Bowman v. Sears, Roebuck & Co.*, 245 Pa.Super. 530, 369 A.2d 754 (1976). The moving party bears the burden of demonstrating clearly that there is no genuine issue of material fact. *Prince v. Pavoni*, 225 Pa.Super. 286, 302 A.2d 452 (1973); *Schacter v. Albert*, 212 Pa.Super. 58, 239 A.2d 841 (1968). *LeGrand v. Lincoln Lines, Inc.*, 253 Pa.Super. 19, 22, 384 A.2d 955, 956 (1978).

On this view of the evidence, the facts may be stated as follows.

In 1973, appellant was employed by the Ingersoll–Rand Company at its Standard Pump–Aldrich Division (hereafter SP–AD) as manager of customer services and technical service engineer. Appellant had been employed at SP–AD since 1959, when Ingersoll–Rand acquired the Aldrich Pump Company. Before that, he had been employed by the Aldrich Pump Company since 1944. Appellant's employment at SP–AD was at will and could be terminated without notice by either party. Appellant was a good employee who, in addition to being technically accomplished, was, in the words of Lee Topp, general manager of SP–AD in 1973, "willing to

do anything for the company." Record at 39a. Although outspoken and opinionated, appellant had never been insubordinate.

In February 1973, appellant was asked by SP–AD to travel to Italy to inspect pumps SP–AD had sold to Italsider, the national steel company of Italy. The pumps were not working properly, and appellant was to find out what the problem was and make a recommendation to SP–AD as to how it should be corrected. Appellant went to Italy, analyzed the problem, and submitted reports to Topp and SP–AD's department heads recommending the replacement of certain parts of the pumps and a change in the manufacture of the pump rods to correct machining errors, which he believed to be the ultimate cause of the problem. SP–AD followed many of appellant's recommendations. His criticism of the manufacture of the pump rods, however, antagonized Dennis Burns, manager of SP–AD's manufacturing department. About six weeks after appellant returned from Italy, and while SP–AD was still in the process of determining how to repair the Italsider pumps, Burns, who had been friendly towards appellant, asked appellant into his office, and there "cursed [him] to high heaven for writing his report," and sending it to all SP–AD department heads. Record at 231a. Appellant then accused Burns of lying to Topp regarding the inspection of the Italsider pumps prior to their shipment to Italy. Further heated argument ensued among Burns, appellant, and others who had been invited into the discussion, but no resolution was achieved. The next day appellant was informed by Steve Sandy and Dick Frick, his superiors, that he would not be returning to Italy to repair the pumps, and thereafter appellant was no longer involved in the Italsider project.

During the period in which these events occurred, Topp decided to transfer appellant from his position in SP–AD's financial control department to a new position in the manufacturing department. Topp's reasons for the transfer were as follows:

We had Charlie reporting, as I indicated to you, to Dick Frick, who was associated with the financial department. And, there were reasons that were particular to that company for that particular arrangement with Frick.

As we were growing--excuse me, as Ingersoll–Rand was growing--I'm putting myself in the old context--it became apparent that we had to have integrity of responsibility for field service with manufacturing. And so, we decided--they decided--I decided, that is going to confuse everything, to transfer Charlie Yaindl to the manufacturing department.

And, there were two reasons for that. One is we wanted to have the field service available to us by Charlie Yaindl with the manufacturing department, because there were other field service people in the company who were normally assemblers that already worked for manufacturing. So, we wanted to integrate the field service portion of the company.

Further, there was a need to develop in manufacturing far more cost estimating ability on Aldrich products. And, I felt that Charlie Yaindl could make a contribution to that area, because he had a long record of experience in designing and in field work with those products. And, it seemed that he could do that job.

Record at 36a–37a.

On May 8, 1973, Burns again asked appellant into his office and there informed him that he had a position he wanted appellant to accept. Without inquiring about the position, appellant refused the offer, saying he did not wish to work for Burns. Record at 238a–39a. Appellant continued to refuse the offer even after he learned from Walt Jennings, head of the financial control department, that his current position was being eliminated and SP–AD had no position for him other than the one offered by Burns. Not until James Sheedy, SP–AD's manager of industrial relations, was called to the meeting and urged appellant to accept did appellant relent by saying: " 'Okay, I'll take the job. I'm not volunteering for it.' " Record at 250a. The

meeting, however, did not end at this point. Burns and Sheedy criticized appellant's attitude towards the company and accused him of being "difficult." Record at 250a. Appellant defended himself, and the discussion became animated. Finally, Burns said, " 'You are not so good, Yaindl. You called me a liar.' " Record at 251a. Appellant then said, " 'I didn't call you a liar. You are a liar, and you admitted this in front of Floyd Riegel when you lied to Lee Topp.' " *Id.* Burns yelled at appellant, but appellant "just sat back and let him holler . . . ." Record at 253a. After Burns calmed down, appellant repeated that he would take the job, but Burns yelled at him again, saying, " 'I don't want you.' " *Id.* So appellant said, " 'Okay,' " and walked out. *Id.*

Burns and Sheedy informed Topp concerning the incident, and Burns informed Topp of his desire not to have appellant in his department. Topp enjoyed final authority over all hiring and firing decisions at SP–AD, but had, as a practical matter, delegated his authority to the heads of the various departments. He therefore acceded to Burns's wish, and when appellant returned to the plant the next day, he learned what he already suspected, that he was fired from SP–AD. Record at 254a–55a. Appellant removed his belongings from his office, and went through the plant to say good–bye to his friends. Record at 255a–56a. Before he left, John Morgan, SP–AD's quality control man, offered to "set something up" for appellant at another division of Ingersoll–Rand. Morgan then called David Deshler, who was responsible for hiring service personnel at Ingersoll–Rand's Turbo Products Division (hereafter Turbo), and recommended appellant as "a real good serviceman" who was available for hire. Several weeks later appellant was interviewed by Deshler for a job at Turbo. At the interview Deshler told appellant he wished to hire him. However, appellant never was hired by Turbo. According to Deshler's deposition, after his interview with appellant he was informed by Sheedy that appellant was still employed at SP–AD. Since it was not Deshler's practice "to pirate"

employees from other Ingersoll–Rand divisions, Deshler did not follow up his interview. According to appellant's deposition, two weeks after the interview Deshler telephoned him and said that he could not offer him a job because he " 'just got a call from Tom Bennett saying I'm not allowed to hire you, and if I do he's going to take it up with the group vice–president.' " Record at 264a.

Thomas Bennett was a group general manager at Ingersoll–Rand in 1973. In general, he was responsible for the operations of all divisions within Ingersoll–Rand's pumping and condensing group. That group included SP–AD but did not include Turbo, which was included in Ingersoll–Rand's condenser group. Bennett, in his deposition, admitted that he telephoned Richard Babcock, who along with Deshler was responsible for hiring service personnel at Turbo. Bennett informed Babcock that appellant had been terminated at SP–AD for insubordination to a senior manager, and while Bennett did not have authority to order Babcock not to hire appellant, he asked Babcock to consider appellant's insubordination in reviewing appellant's employment possibilities at Turbo. Record at 156a, 162a–63a.[1] According to Bennett, he placed his telephone call after he was informed by Topp that appellant had spoken to "a lot of people" at SP–AD that he was getting a job at Turbo at a salary higher than his old one at SP–AD. Record at 156a. Topp thought it wrong "for somebody who had been terminated because of insubordination to find in the same company an opportunity with more money," Record at 157a, and Bennett agreed. Bennett claimed to be especially disturbed because

the broadcasting that [appellant] was apparently doing in Allentown was demeaning, you know, an additional demeaning point to the management in Allentown, and that Charlie had to stand responsible for that.

1. Bennett candidly admitted that although he did not tell Babcock not to hire appellant, "[i]n all fairness, I would think that, you know, when you get a call like that from a guy in my position, while I didn't say it, I think it was something that I would expect Babcock to take into serious assessment." Record at 163a.

If Charlie had quietly slipped away someplace and got another job, I wouldn't have felt too strong about it. But when he runs up and down the streets of Allentown, apparently bragging about it, it puts the management out there in a hell of a position.

\* \* \* \* \* \*

[T]here is no question that I felt that it would be embarrassing and demoralizing to the senior management in Allentown to have this guy make an issue of it and demean their position.

Record at 167a–68a.

Bennett also stated in his deposition that before telephoning Babcock, he received a letter from appellant claiming that he had been improperly discharged from his position at SP–AD and asking Bennett to investigate the matter. Because he previously had been SP–AD's general manager, Bennett knew appellant, and asked Sheedy to conduct an independent investigation, and prepare a report. After interviewing appellant at his home, Sheedy sent Bennett the requested report. On the basis of the report and his own discussions with Topp, Burns, and others at SP–AD, Bennett concluded that appellant had been properly discharged.

## II

In any civilized employer–employee relationship there is an implicit recognition that not every act of insubordination or misconduct ethically justifies an employer in firing the employee in question who may have been a faithful and diligent employee for years.

*Resilient Floor, etc. v. Welco Mfg. Co. Inc.*, 543 F.2d 1029, 1033 n. 4 (8th Cir. 1976).

The problem is to make this implicit recognition explicit by stating it in the form of legally enforceable principles.

▆▆▆ It has for many years been said that as a general principle, an employer "may discharge an employee with or without cause, at pleasure, unless restrained by some contract." *Henry v. Pittsburgh & Lake Erie Railroad Co.*, 139

Pa. 289, 297, 21 A. 157 (1891).[2] While this right has been significantly circumscribed by Congress and the General Assembly (for example, in legislation proscribing racial and sexual discrimination in employment),[3] it is still true that "[i]n general, there is no non–statutory cause of action for an employer's termination of an at–will employment relationship." *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 31, 386 A.2d 119, 120 (1978). Recently, however, Pennsylvania has joined the growing number of states [4] recognizing that when the discharge of an employee–at–will threatens public policy, the employee may have a cause of action against the employer for wrongful discharge. *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974); *Hunter v. Port Authority of Allegheny County*, 277 Pa.Super. 4, 419 A.2d 631 (1980); *Reuther v. Fowler & Williams, Inc., supra.* The basis of this limited, nonstatutory cause of action is an appreciation of the fact that the employer's interest in running his business efficiently, profitably, and as he sees fit is not absolute; important as it is, it exists in the context of, and must sometimes yield to, other interests, including the interest of the employee in making a

**2.** For the doubtful legal basis giving birth to this principle, *see* Summers, Individual Protection Against Unjust Dismissal: Time for a Statute, 62 Va.L.Rev. 481, 485 (1976).

**3.** *See generally* Summers, *supra*, at 491–99; Blumrosen, Settlement of Disputes Concerning the Exercise of Employer Disciplinary Powers: *United States Report*, 18 Rutgers L.Rev. 428 (1964).

**4.** *See Harless v. First Nat. Bank in Fairmont*, W.Va., 246 S.E.2d 270 (1978); *Jackson v. Minidoka Irrigation Dist.*, 98 Idaho 330, 563 P.2d 54 (1977); *Campbell v. Ford Industries, Inc.*, 274 Or. 243, 546 P.2d 141 (1976); *Nees v. Hock*, 272 Or. 210, 536 P.2d 512 (1975); *Monge v. Beebe Rubber Co., Inc.*, 114 N.H. 130, 316 A.2d 549 (1974); *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973); *Trombetta v. Detroit, Toledo & Ironton R. Co.*, 81 Mich.App. 489, 265 N.W.2d 385 (1978); *Sventko v. Kroger Co.*, 69 Mich.App. 644, 245 N.W.2d 151 (1976); *Montalvo v. Zamora*, 7 Cal.App.3d 69, 86 Cal.Rptr. 401 (1970); *Glenn v. Clearman's Golden Cock Inn, Inc.*, 192 Cal.App.2d 793, 13 Cal.Rptr. 769 (1961); *Petermann v. International Brotherhood of Teamsters*, 174 Cal.App.2d 184, 344 P.2d 25 (1959); *Pstragowski v. Metropolitan Life Ins. Co.*, 553 F.2d 1 (1st Cir. 1977); *Foley v. Community Oil Co., Inc.*, 64 F.R.D. 561 (D.N.H.1974); *cf. Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977).

living and the interest of the public in seeing to it that the employer does not act abusively and a proper balance between the employer's and the employee's interests is preserved. *Geary v. United States Steel Corp., supra; Monge v. Beebe Rubber Co., supra; Percival v. General Motors Corp.,* 400 F.Supp. 1322 (E.D.Mo.1975), *aff'd* 539 F.2d 1126 (8th Cir. 1976); Blades, Employment at Will v. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum.L.Rev. 1404 (1967); Comment, 14 Rutgers L.Rev. 624 (1960).

Thus in *Geary* the Supreme Court recognized that "there are areas of an employee's life in which his employer has no legitimate interest," 456 Pa. at 184, 319 A.2d at 180, adding: "An intrusion into one of these areas might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened." *Id.* Our decisions in *Hunter* and *Reuther* each involved a situation in which the employer's interest in running his business was limited by considerations of public policy. In *Hunter* we held that given the public policy not to stigmatize unnecessarily former offenders, a public employer could not deny a former offender employment on the basis of a prior conviction for which the offender had been pardoned, unless the conviction was reasonably related to fitness to perform the job sought. In *Reuther* we held that given the importance of trial by jury to our legal system, an employer could not discharge an employee because he accepted jury duty.

The precise extent to which the employer's interest in running his business is limited by considerations of public policy cannot be stated but must be worked out on a case–by–case basis. Thus in *Geary* the Supreme Court expressly declined "to define in comprehensive fashion the perimeters" "of the employer's interest," 456 Pa. at 184, 319 A.2d at 180, instead only deciding that in the case before it, no action for wrongful discharge would lie because the complaint itself, in the majority's view, disclosed that the employer had a plausible and legitimate reason for discharging the employee–at–will, and the discharge violated no

clear mandate of public policy. In the course of reaching this decision, however, the Court recognized that the legitimacy of the employer's reason for discharging an employee–at–will might depend upon the employer's motive and manner of effecting the discharge. The Court particularly relied upon the decision of the United States Supreme Court in *American Bank & Trust Co. v. Federal Reserve Bank*, 256 U.S. 350, 41 S.Ct. 499, 65 L.Ed. 983 (1921), which it stated as follows:

> [I]ndependent banks were held to have a cause of action against a federal reserve bank which accumulated checks drawn against the plaintiffs for the purpose of forcing them to join the federal reserve system. The right of a holder to present checks for payment was not questioned, but the exercise of that right in a particular manner and for a particular end was held to be impermissible.

456 Pa. at 178, 319 A.2d at 177.

On the case before it the Court found that the employer's exercise of the right to discharge an employee–at–will was not impermissible because no facts were alleged from which one could infer that the employer discharged the employee with the specific intent either to harm him, or coerce him to break any law, or otherwise compromise himself. 456 Pa. at 178–180, 319 A.2d at 177–178.[5]

 As one considers the factors to be weighed in an action for wrongful discharge, one is struck by the fact that they are substantially identical to the factors to be weighed in an action for intentional interference with the performance of a contract. That action arises when a person

5. It is sometimes said that *Geary* recognizes an action for wrongful discharge by an employee–at–will in two situations: 1) where the employer's discharge is motivated by a specific intent to harm the employee; and 2) where the discharge violates a clear mandate of public policy. *See O'Neill v. ARA Services, Inc.*, 457 F.Supp. 182, 186 (E.D.Pa.1978). While this is a fair reading of *Geary*, as our foregoing discussion indicates, we think it more accurate to say that *Geary's* proscription of a discharge motivated by a specific intent to harm is rather an example of when a discharge violates public policy. *See Monge v. Beebe Rubber Co., supra*, holding that a discharge motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system.

intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract . . . .

Restatement (Second) of Torts § 766 (1979).

*See also Adler, Barish, Daniels, etc. v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (1978), *appeal dismissed,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979); *Allied Sec., Inc. v. Security Unlimited, Inc.,* 265 Pa.Super. 297, 401 A.2d 1219 (1979). Whether an intentional interference with the performance of a contract is improper depends upon the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979).

*See also Adler, Barish, Daniels, etc. v. Epstein,* 482 Pa. at 433, 393 A.2d at 1184. The first five of these factors must also be weighed by the court in determining whether a discharge was wrongful. If the remaining two factors seem inapplicable to an action for wrongful discharge, that is only because the proximity of the employer's conduct to the discharge is always the same (*viz,* the employer's conduct is the immediate cause of the discharge), and the relations between the parties are always the same (*viz,* employer–employee). Probably, therefore, the most useful way to view an action for wrongful discharge is as a particularized instance of a more inclusive tort of intentional interference

with the performance of a contract.[6] This suggestion is not novel, for the affinity between the actions has been noted elsewhere, e. g., *Campbell v. Ford Industries, Inc.*, 274 Or. at 252–258, 546 P.2d at 147–50; Blades, *supra*, and the actions are commonly joined in a single complaint. *See Johnston v. Farmers Alliance Mutual Insurance Co.*, 218 Kan. 543, 545 P.2d 312 (1976); *Martin v. Platt*, Ind.App., 386 N.E.2d 1026 (1979); *Becket v. Welton Becket & Associates*, 39 Cal.App.3d 815, 114 Cal.Rptr. 531 (1974); *Mallard v. Boring*, 182 Cal. App.2d 390, 6 Cal.Rptr. 171 (1960).

▐ It has been said that the two actions differ because an action for intentional interference with the performance of a contract requires that the defendant's interference be unprivileged, whereas in an action for wrongful discharge privilege is irrelevant. *See Geary v. United States Steel Corp.*, *supra*, 456 Pa. at 177, 319 A.2d at 176. But saying that one is not liable for intentionally interfering with the performance of a contract because his acts were "privileged" is no more than saying that a consideration of the factors listed in section 767 of the Restatement leads to the conclusion that the actor's interference was not improper in the circumstances of the particular case. *See* Restatement (Second) of Torts § 767, Comment b (1979). It may also be said that the two actions differ because the tort of intentional interference with the performance of a contract contemplates a situation in which three persons are involved–an actor A who intentionally and improperly interferes with the performance of a contract between X and Y. If a sole proprietor discharges an employee, only two persons are involved. Thus it may be said that while the sole proprietor

---

**6.** Of course, an action for intentional interference with the performance of a contract lies even though the contract interfered with is terminable at the will of the parties. Restatement (Second) of Torts § 766, Comment g (1979). Moreover, while at least one court has taken the position that an action for wrongful discharge lies in assumpsit, *Monge v. Beebe Rubber Co.*, *supra*, Pennsylvania appears to adhere to the generally held view that the action lies in trespass. *See Reuther v. Fowler & Williams, Inc.*, *supra.* It should be noted, however, that an argument may be made that the action for wrongful discharge sounds in both assumpsit and trespass. *See generally* Summers, *supra* ; Blades, *supra.*

may commit the tort of wrongful discharge, he cannot commit the tort of intentional interference with the performance of his *own* contract between his employee and himself. This does not, however, impress us as a reason for not assimilating the two actions to each other. In many cases involving the discharge of an employee there will be three persons involved; the employer, for example, will be a corporate employer, and the discharge of one employee will be executed by another employee. In such a case we see no reason why it may not be said *either* that the corporation is liable for wrongfully discharging its employee, as we held it could be in *Reuther v. Fowler & Williams, Inc., supra,* where an employee was held to have a cause of action against his former corporate employer because one of the corporation's employees discharged him for accepting jury duty, *or* that the corporation is liable for intentionally interfering with the performance of a contract, the contract being the contract between the corporation and the discharged employee, the interference being by the employee executing the discharge, and the corporation's liability for that interference being based on the fact that the employee executing the discharge was acting, at least in part, from a purpose to serve the corporation. *See* Restatement (Second) of Agency, §§ 228(1)(c), 230, 236 (1958).[7] Of course, if the employee executing the discharge acted *solely* for his personal benefit as, for example, to further a scheme to defraud the corporate employer, *cf. Campbell v. Ford Industries, Inc., supra,* the corporation would not be liable. *See generally Lunn v. Yellow Cab Co.,* 403 Pa. 231, 169 A.2d 103 (1961); *Howard v.*

7. We are aware of authority that a principal will not be held vicariously liable when one of its employees improperly discharges another employee. *E. g., Houser v. City of Redmond,* 91 Wash.2d 36, 586 P.2d 482 (1978); *Patterson v. Philco Corp.,* 252 Cal.App.2d 63, 60 Cal.Rptr. 110 (1967); *Allison v. American Airlines, Inc.,* 112 F.Supp. 37 (N.D.Okl.1953). *And see* Restatement (Second) of Agency, § 248, comment c (1958) (master not liable in tort for act of servant who improperly causes master to break contract with one of his own servants; is liable for breach of contract but not for punitive damages). This authority, however, seems to us substantially undercut by the cases allowing recovery against a corporate employer for wrongful discharge of the employee.

*Zaney Bar*, 369 Pa. 155, 85 A.2d 401 (1952); *Fitzgerald v. McCutcheon*, 270 Pa.Super. 102, 410 A.2d 1270 (1979); Restatement (Second) of Agency §§ 228(2), 235 (1958).[8]

█ In any event, the exact extent to which the action for wrongful discharge may be assimilated to the action for intentional interference with the performance of a contract need not be decided now. It is enough to note that in appraising the propriety of the lower court's order dismissing appellant's claims, we must weigh several factors, balancing against appellant's interest in making a living, his employer's interest in running its business, its motive in discharging appellant and its manner of effecting the discharge, and any social interests or public policies that may be implicated in the discharge.

### III

Appellant claims (A) that he was wrongfully discharged from SP–AD, and (B) that the employees of SP–AD intentionally interfered with his prospective employment relationship with Turbo.[9]

**8.** The employee would be liable, however. It is widely held that an agent is liable if he intentionally and improperly induces his principal to break its contract with a third person. *Chanay v. Chittenden*, 115 Ariz. 32, 563 P.2d 287 (1977); *Tash v. Houston*, 74 Mich.App. 566, 254 N.W.2d 579 (1977); *H. F. Philipsborn & Co. v. Suson*, 59 Ill.2d 465, 322 N.E.2d 45 (1974); *Pennington Trap Rock Co. v. Pennington Quarry Co.*, 22 N.J.Misc. 318, 38 A.2d 869 (1944); *Vassardakis v. Parish*, 36 F.Supp. 1002 (S.D.N.Y.1941); Note, 89 U. of Pa.L.Rev. 250–51 (1940); 45 Am.Jur.2d Interference § 54 (1969). This principle applies where the agent is the principal's employee, and the broken contract is between the principal and another employee. *Worrick v. Flora*, 133 Ill.App.2d 755, 272 N.E.2d 708 (1971; Avins, Liability for Inducing a Corporation to Breach its Contract, 43 Cornell L.Q. 55, 62 (1957).

**9.** The claim for wrongful discharge is made by Count I of the complaint, the claim for interference with prospective employment, by Count II. The complaint also has a Count III, which incorporates both Counts I and II and alleges that "[a]s a direct result of the conduct" alleged in these counts, appellant "has been and will be deprived of pension and other benefits ...." Record at 5a. This does not appear to us to state any cause of action distinct from the actions pleaded by Counts I and II; we therefore regard it as surplus.

A

■ If appellant's claim that he was wrongfully discharged were submitted to a jury, the most favorable view of the evidence that the jury could take, it seems to us, would be something like this: As manager of SP–AD's manufacturing department, Burns was responsible for the failure of the Italsider pumps, and was angered by appellant's report to Topp and SP–AD's department heads pointing this out. Burns had lied to Topp regarding inspection of the pumps, appellant knew of the lie, and Burns knew appellant knew of the lie. Burns soon found the opportunity to vent his illwill against appellant when Topp, for reasons unrelated to appellant's report or activities involving the Italsider project, authorized appellant's transfer to Burns's department. At the meeting at which he told appellant of the transfer, Burns, knowing appellant's quick temper and blunt manner of speech, goaded appellant into calling him a liar, and then used appellant's indiscretion as an excuse to discharge him. Burns could discharge appellant because Topp had effectively delegated to Burns and the other department heads his power to discharge employees and he acceded to appellant's discharge.

On this view of the evidence the jury could find that while personal motives obviously influenced Burns's decision to discharge appellant, Burns nevertheless acted, in part, to serve SP–AD, in the sense of getting rid of a disruptive employee, and therefore his acts were within the scope of his employment. Restatement (Second) of Agency § 236 and Comment b (1958). We are unable, however, to discern any clear public policy that was threatened by appellant's discharge. Although appellant claims that the Italsider pumps posed a serious safety hazard to those working near them, his claim is unsubstantiated. The only mention in the record regarding the safety of the pumps is found in appellant's deposition where he stated that he recommended that the plunger rods in the pumps be replaced immediately

> because we had a lot of plunger rod failures in the past year and it's been rather hazardous in some locations and

we have been very lucky that nobody was killed. These things snap and you don't want to be around a machine with these heavy pieces flying out.

Record at 225a.

No indication of the specific hazards supposedly posed by the pumps at the Italsider plant is to be found in the record, nor any instance of an injury caused by any pump sold by SP–AD to Italsider or anyone else. Moreover, there is no evidence that SP–AD attempted to hide from Italsider the defects in the pumps, or deny its responsibility for the defects. Appellant admits that his recommendations regarding repair of the pumps were, in general, accepted by SP–AD, and that the defective pump rods were replaced within a reasonable time. The only dispute within SP–AD concerned the ultimate cause of the defects in the rods. In this respect the case is similar to *Geary*. There the employee alleged that he had been discharged because he had criticized one of his employer's new products as unsafe. Such a discharge, the employee argued, threatened the public policy in favor of only safe products being marketed. In rejecting this argument the majority of the Court noted that in response to the employee's criticism, the product was withdrawn. 456 Pa. at 180, 319 A.2d at 178.

If we assume, however, that more was at issue than an internal squabble concerning the manufacturing processes necessary to ensure satisfactory performance of SP–AD's pumps, and that a public policy in favor of safe products is implicated, still, any potential liability to which Ingersoll–Rand may have been exposed on account of Burns's malicious discharge ended with Bennett's independent, good–faith review of the discharge, conducted at appellant's request. Perhaps appellant may believe that Bennett's review was not as thorough as it might have been, or that Sheedy's report was biased, although there is no allegation that Sheedy misstated any facts. Even so, the fact that a review by a high company official was conducted weighs heavily in Ingersoll–Rand's favor. Moreover, Bennett could have properly concluded that even if Burns was responsible for

the failure of the Italsider pumps, and then lied to Topp concerning their inspection, nevertheless appellant's reluctance to accept a position under Burns was unjustified, especially given the fact that appellant's current position was being eliminated, and that the company needed someone of appellant's experience in the manufacturing department and had no other position to offer him.

Finally, we note nothing unusual in the manner of appellant's discharge. He was paid his earned salary; he received two months vacation pay; and the company continued his Blue Cross coverage until the end of May 1973.[10] Moreover, four months after the discharge, appellant obtained employment 85 miles from his home with Worthington Pumps, Inc., at a 20% increase in salary. It is of course true that SP–AD was better able to absorb the loss of an experienced employee than appellant was able to absorb the unexpected loss of his job. But a company, no matter how large, can afford only so many uneconomic decisions, and it is well to remember that the marketplace contains a system of rewards and penalties independent of those prescribed by law. To the extent that appellant's discharge was uneconomic, SP–AD has been penalized by the loss of a valuable employee.

## B

We believe, however, that the lower court went too far in granting summary judgment against appellant's claim that the employees of SP–AD improperly interfered with his prospective employment relationship with Turbo.

We have referred above to the tort of intentional interference with the performance of a contract. In principle this tort includes the tort of intentional interference with a prospective contractual relation, an action for which arises when a person

10. Although appellant's complaint alleges that his discharge deprived him "of pension, and other benefits customarily enjoyed by Defendant's employees," Record at 5a, it does not appear that this deprivation affected appellant's ability to meet his expenses during the period immediately following his discharge.

intentionally and improperly interferes with another's prospective contractual relation ... whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979).[11]

11. It is sometimes said that an action for intentional interference with a prospective contractual relation consists of four elements, *viz*:

(1) a prospective contractual relation;

(2) the purpose or intent to harm the plaintiff by preventing relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage resulting from the defendant's conduct.

*See Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 208, 412 A.2d 466, 471 (1979); *Glenn v. Point Park College*, 441 Pa. 474, 479–80, 272 A.2d 895, 898–899 (1971); *Behrend v. Bell Telephone Co.*, 242 Pa.Super. 47, 61, 363 A.2d 1152, 1159 (1977). However, as already indicated in our discussion above, the third element, "the absence of privilege or justification on the part of the defendant," is merely another way of stating that the defendant's conduct must be improper. Further, the second element, "purpose or intent to harm the plaintiff by preventing the relation from occurring," must be understood as requiring only an intention to interfere with the plaintiff's prospective contractual relation, and not malevolent spite by the defendant. True, the Court in *Glenn v. Point Park College, supra,* 441 Pa. at 481, 272 A.2d at 899, stated: "It must be emphasized that the tort we are considering is an intentional one: the actor is acting as he does *for the purpose of causing harm* to the plaintiff." (Original emphasis.) *See also Geary v. United States Steel Corp., supra,* 456 Pa. at 179, 319 A.2d at 178 ("specific intent on the part of the defendant to cause harm to the plaintiff must be alleged to make out a cause of action"). However, the Second Restatement of Torts (a tentative draft of which was relied upon by the Court in *Glenn*) specifically states that the defendant's ill–will is not an element of the tort. Restatement (Second) §§ 766, Comment r, 766B, Comment f (1979) ("Ill will on the part of the actor toward the person harmed is not an essential condition of liability under the rule stated in this Section. He may be liable even when he acts with no desire to harm the other"). *See also* Restatement (Second) of Torts §§ 766B, Comment d, 767, Comment d (1979). Moreover, the Supreme Court has stated that it has "repeatedly looked to the Restatement as authority for the elements of a cause of action for intentional interference with existing contract relations." *Adler, Barish, Daniels, etc. v. Epstein,*

Here there is no question that appellant enjoyed a substantial prospect of being employed at Turbo. Two weeks after his discharge at SP–AD he was interviewed by Deshler, who was responsible for hiring Turbo's service personnel. During the interview, Deshler expressed his desire to hire appellant, and would have hired him but for the deliberate intervention of Sheedy and Bennett.

As previously stated, according to Deshler's deposition, after his interview with appellant Sheedy told him that appellant was still employed at SP–AD. A jury could find that this was a conscious misrepresentation by Sheedy, who knew at the time that appellant had been discharged and also knew that it was unlikely that Bennett would reverse appellant's discharge. A jury could also find that when Sheedy made this misrepresentation to Deshler, he knew that because of it Deshler would not hire appellant. On this view of the evidence, the means used by Sheedy to prevent appellant's prospective employment at Turbo (*viz*, a lie) were highly improper. Moreover, while as industrial relations manager at SP–AD, Sheedy might have an interest in the sort of sanction SP–AD should impose upon appellant because of the incident with Burns, Sheedy's interest in appel-

*supra*, 482 Pa. at 430 n. 13, 393 A.2d at 1182 n. 13, and it has apparently adopted sections 766 and 767 of the Second Restatement as accurate embodiments of the law of this Commonwealth. *Adler, Barish, Daniels, etc. v. Epstein, supra*, at 431–34, 393 A.2d at 1183–1185. *See also, Allied Sec., Inc. v. Security Unlimited, Inc., supra.*

Finally, if any doubt remains that specific intent to harm is not required in Pennsylvania in an action for intentional interference with a prospective contractual relation, in *Birl v. Phila. Electric Co.*, 402 Pa. 297, 300, 167 A.2d 472, 474 (1961), which was also relied upon by the Court in *Glenn*, the Court, quoting the Restatement, Torts, § 766, Special Note to comment m, stated:

"There are frequent expressions in judicial opinions that 'malice' is requisite for liability . . . . But the context and course of decision make it clear that what is meant is not malice in the sense of ill will but merely purposeful interference without justification."

[Case citations omitted.]

We note that at least one other court has rejected the argument that Pennsylvania requires a showing of specific intent to cause harm in an action for intentional interference with the performance of a contract. *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 19–20 (1st Cir. 1979).

lant's prospective employment at Turbo was much more attenuated. Indeed, it was so attenuated that a jury might justifiably conclude that in lying to Deshler, Sheedy was motivated by a desire to punish appellant for his reluctance to accept a position at SP–AD under Burns. This desire pales in significance when compared to appellant's right to earn a livelihood--a right guaranteed by the Pennsylvania Constitution. *See Hunter v. Port Authority of Allegheny County, supra*; Pa.Const., article I, section 1.[12]

We recognize that appellant's deposition indicates a somewhat different cause for Turbo's refusal to hire him. According to appellant, Deshler told him at his interview that Sheedy had previously asked him not to hire appellant, but that he intended to hire appellant anyway, and then, two weeks after the interview, Deshler telephoned and said he could not hire appellant because Bennett had threatened to speak with a group vice–president if he did. However, even if this account were credited by a jury instead of Deshler's own account as given at his deposition, we could not say, as a matter of law, that the interference with appellant's prospective employment at Turbo was proper.

As a group general manager, Bennett had broader responsibilities within Ingersoll–Rand than Sheedy, but those responsibilities did not extend to Turbo's operations. Moreover, while honest advice by Bennett to Deshler concerning appellant's job application may not have been actionable, *see Menefee v. Columbia Broadcasting System, Inc.*, 458 Pa. 46, 329 A.2d 216 (1974); Restatement (Second) of Torts §§ 770, 772 (1979), Bennett did more than give Deshler advice. He used his position as a group general manager to eliminate appellant's job possibilities at Turbo by threatening Deshler, a subordinate within Ingersoll–Rand's corporate hierarchy, that if appellant were hired, he would discuss the matter with a vice–president. In addition, Bennett's testimony implies that but for this single occasion he never interfered with the decision by one division of Ingersoll–Rand to hire a

12. Of course, were the jury to conclude that Sheedy imparted only truthful information to Deshler, Sheedy's interference would not be improper. Restatement (Second) of Torts § 772 (1979).

former employee of another division of Ingersoll–Rand. Record at 165a–66a.

Bennett attempted to justify his interference on the ground that it was necessary to avoid demoralization of SP–AD employees. However, there is no evidence that SP–AD employees in general were demoralized, or would have become demoralized had appellant been employed at Turbo. Indeed, Bennett did not claim that he feared demoralization of SP–AD's workforce, but only demoralization of SP–AD's senior management employees. His fear seems odd, given Topp's testimony that appellant was never insubordinate towards anyone, including Burns, and that his sole reason for not rehiring appellant at SP–AD was appellant's inability to work with Burns. Record at 78a, 80a–81a. As Topp put it: "There was bitterness between Yaindl and Burns. And, as such, as a manager, you don't buy trouble." Record at 47a. However, setting Topp's testimony to the side, and granting that some senior management employees at SP–AD may have been demoralized because of appellant's job prospects at Turbo, the legitimacy of Bennett's interference remains doubtful. Certainly Burns's malicious feelings towards appellant were undeserving of Bennett's protection. Moreover, the feelings of the other senior managers may have resulted from nothing more than appellant's apparent liability to reduce the economic consequences of his discharge by promptly finding a new job that paid more money. The law, however, accords little, if any, weight to the vindictive spirit, but it accords great weight to the individual's right to earn a living. Thus, a jury could find Bennett's attempt to protect the feelings of SP–AD's senior managers unjustified when compared with its detrimental impact on appellant.

If our analysis of Bennett's actions is more critical in connection with appellant's claim of improper interference with his prospective employment relationship with Turbo than it was in connection with appellant's claim of wrongful discharge from SP–AD, this results from our conviction that a manager's pursuit of a former employee and interference with the employee's employment opportunities at another

company constitutes a far greater infringement upon the employee's right to earn a living than does the manager's discharge of the employee from the manager's own company. *Compare Birl v. Philadelphia Electric Co.*, 402 Pa. 297, 167 A.2d 472 (1961).

As noted above, it must be shown not only that there was intentional and improper interference with another's prospective contractual relation, but that that interference induced or otherwise caused a third person not to enter into the prospective relation. The question arises, therefore, whether here there was such a "third person." [13] We recognize that legally Turbo was not a separate company from SP–AD; both were divisions within one company—Ingersoll–Rand. But as a practical matter, they were separate companies. According to Bennett, in 1973, SP–AD and Turbo had only a distant relationship with each other:

> [SP–AD] was part of the pump and condenser group. The Turbo Division in Phillipsburg was part of the gas compression and power machinery group. Both divisions reported within the group to independent group vice–presidents and both group vice presidents reported at that time to what was referred to as the executive committee, which was the chairman, the president and the four executive vice–presidents. So the first time that the two would be connected would be at the top six levels, top six jobs of the company.

Record at 171a–72a.

*See also* Record at 50a–53a. Bennett characterized the relationship between SP–AD and Turbo as "separate verticalized divisions." Record at 166a. Furthermore, from 1959 to 1964, SP–AD's legal identity corresponded to the manner

---

**13.** It is arguable that whether there was a third person should not be dispositive. If one were to adopt the view that a corporate employer may be held vicariously liable when one of its employees improperly discharges another employee, it would seem that so could the employer be held vicariously liable when one of its employees intentionally and improperly interferes with another's prospective contractual relation with the employer. *See* note 7, *supra,* and accompanying text. *And see generally Hunter v. Port Authority of Allegheny County, supra.*

of its operation–*i. e.*, SP–AD was a separate, wholly–owned subsidiary of Ingersoll–Rand. Record at 218a.

The law should· give the same significance to the forms used to conduct a business enterprise as do the participants in the enterprise. Here, those connected with Ingersoll–Rand treated SP–AD and Turbo as separate enterprises connected only at the highest level of the company in much the same way as subsidiary corporations are connected by a holding company. The legal effect of Bennett's interference with appellant's employment opportunities at Turbo should not depend upon a fact so fortuitous as the date that Ingersoll–Rand changed SP–AD's legal status from that of a subsidiary to that of a corporate division. Rather, the crucial issue is whether Bennett's interference was " 'sanctioned by the "rules of the game" which society has adopted . . . .' " *Glenn v. Point Park College, supra*, 441 Pa. at 482, 272 A.2d at 899 (citation omitted). In the present case, there is sufficient room for a difference of opinion regarding this issue that its determination should be left to the jury "to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." Restatement (Second) of Torts § 767, Comment 1 (1979).[14]

 Thus, we turn to the final issue before us: Can Ingersoll–Rand be liable for Sheedy's or Bennett's improper

14. We recognize that the Restatement (Second) of Agency § 347(2) (1958) provides:

> Where, because of his relation to a third person, a master owes no duty, or a diminished duty, of care, a servant in the performance of his master's work owes no greater duty, unless there has been reliance by the master or by a third person upon a greater undertaking by the servant.

Bennett is not entitled to the benefit of this provision, as a matter of law, because, as just noted, the evidence is that Ingersoll–Rand's relationship to SP–AD and Turbo was, as a practical matter, that of a holding company to separate, independent subsidiaries. If SP–AD did not have the right, absent appropriate justification to interfere with Turbo's hiring decision, neither did Bennett, who was acting on SP–AD's behalf. True, an argument may be made that Bennett, as a group general manager, was not within the organizational structure of SP–AD, but rather was part of the umbrella structure established by Ingersoll–Rand to control its various divisions. However, a jury

interference with appellant's employment opportunities at Turbo? We know of no reason to prevent Ingersoll–Rand's liability. Because Ingersoll–Rand, SP–AD, and Turbo operated as separate companies, for purposes of appellant's action they should be treated as separate companies. Furthermore, the evidence is that Sheedy and Bennett were acting within the scope of their employment and on behalf of SP–AD in intentionally interfering with appellant's employment opportunities at Turbo. Because a principal may be liable for its employee's intentional interference with another's prospective contractual relations with a third person, *Klauder v. Cregar*, 327 Pa. 1, 192 A.2d 667 (1977); Restatement (Second) of Agency § 248 (1958), Ingersoll–Rand may be vicariously liable for their acts.[15]

The lower court's dismissal of Count I and Count III of appellant's complaint is affirmed; the lower court's dismissal of Count II of appellant's complaint is reversed.

VAN der VOORT, J., concurs in the result.

might find that Ingersoll–Rand had delegated its right to manage Turbo to the employees of Turbo and had retained only the right of an investor to interfere where necessary to protect the integrity of its investment in Turbo. *See* Restatement (Second) of Torts § 769 (1979). Here Bennett did not act to protect Ingersoll–Rand's investment in Turbo, but its investment in SP–AD. That Ingersoll–Rand's was the sole owner of both Turbo and SP–AD is of course a relevant consideration in determining whether Bennett's interference was proper; but this fact alone does not persuade us that Ingersoll–Rand had the right to interfere with Turbo's employment procedures and order that appellant not be hired. If Ingersoll–Rand did not have that right, absent a showing that its interests at SP–AD or Turbo would be substantially furthered, neither did Bennett.

15. Ingersoll–Rand asserts on this appeal that appellant's complaint is fatally defective because it does not allege "the absence of a privilege on the part of Ingersoll–Rand not to hire [him] at its Turbo Division." Appellee's Brief at 6. Pennsylvania does appear to follow the minority rule by requiring that lack of justification be pleaded by the plaintiff. *See Thompson Coal Co. v. Pike Coal Co., supra*, 488 Pa. at 208, 412 A.2d at 471; Restatement (Second) of Torts § 767, Comment b (1979); Prosser, The Law of Torts § 129 at 942–42 (4th ed. 1971). However, assuming that Ingersoll–Rand's objection to the complaint is cognizable on this appeal from a summary judgment proceeding, we find that appellant's complaint sufficiently pleads that Ingersoll–Rand's interference was improper.