**Richard O. BORESEN**

v.

**ROHM & HAAS, INC.**

**Civ. A. No. 78–2292.**

United States District Court,
E. D. Pennsylvania.

Nov. 30, 1981.

21. 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

22. 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978).

OPINION

JOSEPH S. LORD, III, Chief Judge.

In this diversity action, plaintiff claims that his employer, Rohm & Haas, Inc., improperly and unlawfully discharged him in contravention of the common law of Pennsylvania.[1] On the basis of a stipulated factual record,[2] defendant has moved for summary judgment arguing that Pennsylvania law does not recognize a cause of action for wrongful discharge under the facts of this case. I heard oral argument on October 19, 1981. For the reasons that follow, I grant defendant's motion for summary judgment and enter judgment in favor of Rohm & Haas and against plaintiff on Counts II and III of the complaint.

## I. Applicable Law

### A. Summary Judgment Standards

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

It is well settled that the moving party, in this case defendant, has the burden of demonstrating the absence of a genuine issue as to any material fact. *Fairbanks, Morse & Co. v. Consolidated Fisheries Co.*, 190 F.2d 817, 824 (3d Cir. 1951). Further, in

Samuel C. Stretton, Philadelphia, Pa., for plaintiff.

G. Wayne Rennisen, Philadelphia, Pa., for defendant.

1. Two allegations in plaintiff's complaint are not discussed in this opinion. First, plaintiff alleges in Count I and Count III that, as a Norwegian national, he was discriminated against on the basis of his national origin. At oral argument, plaintiff's counsel formally withdrew these claims asserting that his review of the record disclosed no evidence to support them. I therefore consider these claims to be moot. Second, in Count I of the complaint, plaintiff alleges that defendant's classification of him as a Third Country National denied him significant medical and pension benefits accorded other employees and that this classification was a breach of plaintiff's employment

agreement with defendant. Because the parties' factual and legal presentations on the pending motion for summary judgment fail to address this allegation, I withhold my decision on this claim as well.

2. The factual record in this case consists of a set of forty-two documents attached to Plaintiff's Statement of Fact and Memorandum of Law Pursuant to the Order of the Honorable Joseph S. Lord, III Dated May 4, 1981. Although both plaintiff and defendant have submitted statements of facts relying on this set of documents, my decision is based solely on the documents themselves.

considering defendant's motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

## B. Pennsylvania Law on Wrongful Discharges

At least since 1891, the established common law of Pennsylvania had been that, in the absence of a specific statutory or contractual restriction, an at-will employment contract may be terminated by either the employer or the employee at any time, for good reason, bad reason, or no reason at all. *Henry v. Pittsburgh & Lake Erie Railroad Co.*, 139 Pa. 289, 21 A. 157 (1891). The Pennsylvania courts began to reevaluate this position, however, starting in 1974 when the state Supreme Court decided the landmark case of *Geary v. United States Steel Corporation*, 456 Pa. 171, 319 A.2d 174 (1974). Although declining to reverse the lower court's dismissal of plaintiff's suit, the *Geary* court acknowledged in *dicta* the possible existence of a nonstatutory cause of action for wrongful discharge:

> It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, *particularly where some recognized facet of public policy is threatened.* The notion that substantive due process elevates an employer's privilege of hiring and discharging his employees to an absolute constitutional right has long since been discredited. But this case does not require us to define in comprehensive fashion the perimeters of this privilege, and we decline to do so. We hold only that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship *and no clear mandate of public policy is violated thereby,* an employee at will has no right of action against his employer for wrongful discharge.

456 Pa. at 184, 319 A.2d at 180 (footnote omitted) (emphasis added).

It is now well settled in Pennsylvania that, "when the discharge of an employee-at-will threatens public policy, the employee may have a cause of action against the employer for wrongful discharge." *Yaindl v. Lygersoll-Rand Co.*, 281 Pa.Super.Ct. 560, 422 A.2d 611, 617 (1980). *Accord, Reuther v. Fowler and Williams, Inc.*, 255 Pa.Super.Ct. 28, 386 A.2d 119 (1978).[3] This interpretation of the Pennsylvania law on unlawful discharge has been uniformly applied by all federal courts in this circuit, *see, e. g., Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363 (3d Cir. 1979); *Lekich v. International Business Machines Corp.*, 469 F.Supp. 485 (E.D.Pa.1979); *O'Neill v. A.R.A. Services, Inc.*, 457 F.Supp. 182 (E.D. Pa.1978),[4] with an emphasis on the narrow-

---

**3.** Courts in many other jurisdictions have allowed causes of action in similar circumstances. *E. g., Petermann v. International Brotherhood of Teamsters*, 174 Cal.App.2d 184, 344 P.2d 25 (1959) (employee dismissed for refusal to commit perjury has cause of action for wrongful discharge under public policy exception); *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973) (employee dismissed for filing claim against employer under Workmen's Compensation Statute has cause of action for wrongful discharge under public policy exception); *Fortune v. National Cash Register*, 373 Mass. 96, 364 N.E.2d 1251 (1977) (employee dismissed because the employer wanted to avoid paying him overdue commissions granted a contractual cause of action founded on an implied covenant of good faith and fair dealing in every written employ-

ment contract); *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974) (female employee dismissed as the result of sexual harassment by foreman granted a cause of action for wrongful discharge on the theory that a malicious or bad faith discharge constitutes a breach of the employment contract); *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975) (employee discharged for refusing to attempt to evade jury duty granted a cause of action for wrongful discharge under public policy exception).

**4.** The court in *O'Neill* recognized an action for wrongful discharge under *Geary* in two situations: first, in a case in which the employer's discharge is motivated by a specific intent to harm the employee, and second, in a case in

ness of the public policy exception. *See Arnold v. Great Atlantic & Pacific Tea Co., Inc.,* 461 F.Supp. 425 (E.D.Pa.1978); *McGinley v. Burroughs Corp.,* 407 F.Supp. 903 (E.D.Pa.1975).

## II. Plaintiff's Employment With Rohm & Haas

### A. The Hiring of Plaintiff.

In August 1970, Rohm & Haas placed an advertisement in a technical journal seeking an "experienced leather technician." (Exhibit P–1) Plaintiff responded to that advertisement by letter dated September 10, 1970 in which he described his qualifications and experience. (Exhibit P–1A) On November 20, 1970, D. L. Woodman, the Rohm & Haas personnel manager for Foreign Operations, confirmed a telephone conversation and offered plaintiff the position of "technical leather specialist" for the Tokyo area. (Exhibit P–2) No formal contract of employment appears in the documents upon which my decision must be based.

Plaintiff alleges that he was not advised at the time of his hiring that his benefits would be different from the benefits of an American citizen hired by Rohm & Haas and that he was given a copy of the benefit program developed for American employees. The documents fail to confirm these allegations. A company memorandum dated July 14, 1971 does state that plaintiff "will be accorded those fringe benefits which are outlined in the policy applying to Third Country National Employees." (Exhibit P–3) Plaintiff also alleges, without any support in the documents, that from July 1971 until July 1974 he engaged in extensive correspondence and communication with his superiors at Rohm & Haas, complaining and criticizing his classification

as "Third Party National." In any event, as of December 4, 1974, when plaintiff became a United States citizen, he no longer received any differential treatment with respect to his benefit package. (Exhibit P–4)

### B. Plaintiff's Responsibilities

The parties are in complete disagreement as to plaintiff's duties and responsibilities as a Rohm & Haas employee. Plaintiff claims that he was merely a leather *technician,* acting as a liaison between salesmen and customers, but with no basic sales responsibilities of his own. Defendant claims that plaintiff's technical liaison position carried with it substantial sales responsibilities. Although much support can be found in the documents for defendant's position, most particularly various company documents complimenting plaintiff and others for their proficiency in increasing sales (*See* Exhibits P–13, P–21 to P–24, P–26, and P–28), enough contrary evidence appears in the documents so that, consistent with my responsibility to resolve all inferences of fact in favor of the nonmoving party, I must find that plaintiff was never given any direct sales responsibilities. (*See* Exhibits P–5 through P–14) [5]

### C. Plaintiff's Performance

It is undisputed that plaintiff received a number of informal letters and memoranda praising his performance in the technical and liaison positions as a leather chemist. (*See* Exhibits P–15 through P–29) It is also clear that Rohm & Haas has established employment evaluation policies that appear to contemplate frequent meetings between employees and supervisors both before and after evaluations. (Exhibits P–30 and P–31) Pursuant to company policy,

which the discharge violates a clear mandate of public policy. *O'Neill,* 457 F.Supp. at 186. Although *Geary* could be read in this manner, I prefer the interpretation adopted by a majority of the federal courts discussing this matter and by Judge Spaeth in *Yaindl* to the effect that the specific intent to harm exception is merely an example of when a discharge violates public policy. *See Yaindl,* 281 Pa.Super.Ct. at 573, 422 A.2d at 618 n.5.

5. In 1974, plaintiff's job title was changed from Leather Technician to Leather Product Manager. Paragraph 15 of plaintiff's complaint and defendant's answer establish that this did not represent a change in job responsibility for plaintiff. The title change was made only to improve communication between plaintiff and potential Asian customers who viewed a "technician" as an uneducated man.

plaintiff was formally evaluated in 1974, 1975, and 1976. Some discussion of each of these formal evaluations follows.

*1974 Rating (Exhibit P–32)*: The 1974 report is dated May 15, 1974 and states that it was discussed with plaintiff on that date. Plaintiff received a rating of three minus, meaning that his results met "reasonable expectations." The report does rate him as "weak in commercial marketing matters and weak in communicating orderly, understandable ideas," despite my finding that plaintiff had no direct sales responsibilities. The report also noted that plaintiff was indecisive, tended to ramble on with discontinuity of thought, and needed to improve his reports.

*1975 Report (Exhibit P–33)*: Plaintiff's 1975 evaluation again yielded a score of three minus. This evaluation rated him for meeting targets and commitments, work organization, judgment, decision making, mastery of required skills and knowledge, working relationships, creativity, versatility, and initiative. He received ratings of two (meaning that he usually keeps up with the company's minimum requirements, but requires more than normal supervision) in work organization, decision making, and versatility. Marketing and sales skills were not mentioned in the report. But, contrary to express company policies, plaintiff was never consulted on this evaluation either before or after its preparation.

*1976 Evaluation (Exhibit P–34)*: This evaluation resulted in a rating of two, meaning that plaintiff's performance fell below reasonable expectations to an extent unacceptable for the long term. Plaintiff received a rating of one, meaning a failure to achieve acceptable results, in the sales area, and achieved ratings of only two in the technical aspects of his performance evaluation. The evaluation also found that improvement was necessary in both his oral and written communications. The report concludes that plaintiff's "present job may be too demanding." Although plaintiff contends that the January 1976 evaluation was "secret," he acknowledges a meeting with his supervisor in February 1976 during which time an evaluation of plaintiff was discussed. (*See* Exhibit P–35)

Plaintiff's version of the February 1976 meeting was that a Mr. Winger informed plaintiff that he would never be promoted, that he would never be transferred, that he would no longer get salary increases, and that his career with Rohm & Haas was over. According to plaintiff's statement of facts, Mr. Winger also told plaintiff that Mr. Dickson was "out to get him" because plaintiff had disagreed with Mr. Dickson. The formal documents, however, express great dissatisfaction with plaintiff's performance as an employee on purely substantive grounds. (Exhibits P–35 and P–37) Although plaintiff apparently wrote and complained to Mr. Winger, Mr. Dickson, and Mr. Gregory, the president of Rohm & Haas, concerning the 1976 rating, these letters are not included in the set of documents submitted to the court.

### D. Plaintiff's Termination

A memorandum dated August 2, 1976 from D. C. Garaventi concluded that plaintiff's job was "surplus." It was proposed that plaintiff be replaced by the individual handling laboratory responsibility in the Philippines, not by a sales or marketing specialist. The memorandum asks the addressee to "start a job search to see if any opportunities could be available for [plaintiff] in either the North America region or Europe." (Exhibit P–38) On September 19, 1976 plaintiff asked for a transfer (Exhibit P–39), because of the incorrect evaluation of 1976 and Mr. Winger's representation that he had no future with Rohm & Haas. On October 5, 1976, D. L. Woodman wrote G. A. Misner advising him that plaintiff's official request for a transfer had been received and stating that "this request . . . comes at a very appropriate time." That memorandum also states:

I am not at all optimistic, in fact feel the probability is extremely low, that we will find a position for Mr. Boresen within Rohm & Haas Co. It is imperative that he understand that this probability exists and that he be prepared to undertake an

external job search upon his return to the States.

(Exhibit P–40)

On November 30, 1976 Mr. Woodman addressed a further memorandum to plaintiff. (Exhibit P–41) This memorandum states that Rohm & Haas was initiating an intensive search throughout the company to determine if an appropriate position was available for plaintiff, that in the event no such position was available, Rohm & Haas would agree to assist plaintiff in searching for a position outside of the company, that arrangements were being made for plaintiff and his family to stay in an apartment in Philadelphia for a two week period beginning on or about January 14, 1977, that Rohm & Haas had agreed to pay plaintiff his full salary for a maximum of three months after his return to the United States if another position with the company could not be located, and that if employment with Rohm & Haas was not available, the company would agree to hold plaintiff's household belongings for shipment to Salem, Virginia, his last known United States address, or to his new location.

The final document in the record is a letter from Mr. Garaventi to plaintiff dated May 27, 1977 (Exhibit P–42). The letter stated that Rohm & Haas had not been able to find a suitable job for plaintiff within the company and that it was therefore necessary for plaintiff to seek outside employment. Because his job search was taking longer than had been anticipated, Rohm & Haas agreed to pay plaintiff an additional $5,000. Although May 31, 1977 was his official termination date, Rohm & Haas continued plaintiff's medical coverage through August 15, 1977 and his life insurance coverage through July 31, 1977. The letter concluded with a promise to provide references on plaintiff's behalf to prospective employers.

## III. Holding

Taking these facts in the light most favorable to plaintiff, and applying the substantive principles of law discussed earlier, I hold that defendant is entitled to summary judgment as a matter of law because these facts fail to state a cause of action for wrongful discharge under Pennsylvania law.

First, I find, and the parties apparently agree, that the employment relationship between plaintiff and Rohm & Haas was at-will. Under Pennsylvania law, plaintiff would therefore have no cause of action against Rohm & Haas for his wrongful discharge unless a clear mandate of public policy is violated by the discharge. My complete examination of the stipulated factual record in this case has disclosed no such violation of public policy.

Plaintiff argues that the facts do support a finding that there is a genuine issue as to the material fact whether malice and bad faith, and therefore specific intent to injure plaintiff, can be found in the stipulated record. See note 4 supra. After viewing this record in the light most favorable to plaintiff, and drawing all inferences in his favor, I cannot agree.

I have found that plaintiff was hired as a leather technician with no direct sales responsibilities. It is clear that he was a frequent critic of various company officials and policies as a result of their classification of him as a Third Country National. It is also clear that plaintiff's formal ratings in 1974, 1975, and 1976 were tinged with certain arguable irregularities. For example, in two of those three years he was rated for his sales expertise, a job task that I have found was not within his line of responsibility. Further, at least one of these evaluations was apparently conducted in violation of stated company policies. And these allegedly improper ratings, in turn, engendered more bitter correspondence between plaintiff and his superiors.

This liberal reading of the facts, however, does not rise to a sufficient level to state a cause of action under Pennsylvania law. Rohm & Haas might well have been attempting to rid itself of a troublesome employee, but this alone is not sufficient to state a cause of action under Pennsylvania law. See, e. g., Geary, supra; Yaindl, supra. The company's failure to follow its own evaluation policies is also insufficient

to state a cause of action for wrongful discharge. *See Beidler v. W. R. Grace, Inc.,* 461 F.Supp. 1013, 1015–16 (E.D.Pa.1978), *aff'd,* 609 F.2d 500 (3d Cir. 1979). In short, at most, the facts show only arguably unfair conduct on the part of Rohm & Haas, an insufficient showing under Pennsylvania law. *See Martino v. Transport Workers Union of Philadelphia,* No. 2457 (June 5, 1981) ("no such cause of action was available merely on the ground that the employer's conduct was unfair or wrongful").

Further, uncontroverted evidence in the documents strongly negates any possible inference that defendant was behaving maliciously towards plaintiff. First, and most significantly, his job has been declared "surplus" by Rohm & Haas. According to the documents submitted as the record in this case, no leather technician has been hired to replace plaintiff. Thus, defendant had a separate and quite plausible and legitimate reason for terminating plaintiff even aside from their desire to rid themselves of a troublesome employee. *See Geary,* 456 Pa. at 184–85, 319 A.2d at 180; *Reuther,* 255 Pa.Super.Ct. at 34, 386 A.2d at 118. Second, plaintiff received what appears to be exemplary treatment by Rohm & Haas both before and after his termination. He received three months pay following the conclusion of his job responsibilities plus an additional $5,000 once the decision was made to sever the employer/employee relationship. Rohm & Haas carried plaintiff's life and health insurance for two months beyond the date of his ultimate termination from the company. The company provided plaintiff and his family with an apartment for two weeks in Philadelphia after his return to the United States. Additionally, Rohm & Haas did make efforts to find plaintiff alternative employment first, within Rohm & Haas, and second, outside the company. Finally, the company offered to provide plaintiff with a good reference to any prospective future employer.

Thus, I hold that the circumstances surrounding plaintiff's termination from the

employment of Rohm & Haas do not, as a matter of law, meet the requirements necessary to state a cause of action for wrongful discharge under Pennsylvania law. *Yaindl v. Ingersoll-Rand Co.,* 281 Pa.Super.Ct. 560, 422 A.2d 611 (1980), urged on the court by plaintiff as an example of a liberalizing trend under Pennsylvania law, does not persuade me to hold otherwise. Plaintiff argues that *Yaindl* holds that a balancing test is necessary in order to assess a wrongful discharge claim. This argument fails to persuade me for two independent reasons.

First, I do not view *Yaindl* as the first case in a liberalizing trend in Pennsylvania. Judge Spaeth, the author of the *Yaindl* decision, also wrote *Reuther,* which plaintiff concedes is a narrow statement of the classic public policy exception. Yet Judge Spaeth gives no hint that he is attempting to move beyond that narrow exception in *Yaindl.* The language in *Yaindl* that plaintiff points to, as well as the various factors assessed by Judge Spaeth in that decision, are merely further refinements on the original balance struck in *Geary* between the employer's right to run his own business and the employee's right to retain his employment.

Second, even assuming that *Yaindl* does represent a new, more liberal statement of Pennsylvania law on wrongful discharge, application of the balancing test mentioned by that court still results in a grant of summary judgment on behalf of defendant in this case.[6] The *Yaindl* balance requires the court to "weigh several factors, balancing against appellant's interest in making a living, his employer's interest in running its business, its motive in discharging appellant and its manner of affecting the discharge, and any social interest or public policies that may be implicated in the discharge." *Yaindl,* 281 Pa.Super.Ct. at 577, 422 A.2d at 620.

The claims of Mr. Yaindl and plaintiff are strikingly similar. Both of their discharges could have resulted partly from

---

**6.** A grant of summary judgment can, in certain instances, be appropriate even when the applicable law contains a balancing test. Indeed, in

*Yaindl,* Judge Spaeth upheld the lower court's grant of summary judgment on the wrongful discharge claim on behalf of the employer.

personal animus between the employee and his superiors. But in both cases the employers were acting to terminate disruptive employees. In this case, as in *Yaindl,* no clear public policy appears to have been threatened by the employee's discharge. In both cases, the employees' current positions were being eliminated and the record disclosed no alternative positions within the company for either plaintiff. Finally, both Mr. Yaindl and plaintiff were treated quite decently upon their discharge. Mr. Yaindl was paid his earned salary and two months vacation pay, and his employer extended his health insurance coverage while plaintiff received three months pay following completion of his job responsibilities plus a $5,000 bonus and an extension of both his health and life insurance coverages. Thus, under the "balancing test" applied by the court in *Yaindl,* Rohm & Haas remains entitled to summary judgment in its favor.

### IV. Conclusion

For all the foregoing reasons, I hold that on the basis of a stipulated factual record viewed in the light most favorable to plaintiff, defendant is entitled to summary judgment as a matter of law in that plaintiff's allegations fail to state a cause of action for wrongful discharge under Pennsylvania law.