Anthony McCLEASE,

v.

**R.R. DONNELLEY & SONS COMPANY, et al.**

No. CIV.A. 02–1740.

United States District Court,
E.D. Pennsylvania.

Oct. 9, 2002.

Joanne W. Rathgeber, Rathgeber & Alberts, Doylestown, PA, for Plaintiff.

Jennifer L. Craighead, Barley, Snyder, Senft & Cohen, Lancaster, PA, for R.R. Donnelley and CDC Distribution.

Anthony B. Haller, Hope A. Comisky, Maureen Dwyer, Pepper Hamilton, LLP, Philadelphia, PA, for Genco Corp.

Gary P. Lightman, Lightman, Manochi and Kornilowicz, Philadelphia, PA, for LRI.

## MEMORANDUM

Dalzell, District Judge.

Plaintiff Anthony McClease, an African–American, has filed an amended complaint against R.R. Donnelley & Sons Company ("Donnelley")[1], CTC Distribution ("CTC"), Genco Corporation, and LRI, asserting federal civil rights and state tort claims arising from his employment[2] at Donnelley and CTC's Levittown, Pennsylvania, facility between October 2000 and April 2001, when he was discharged. Specifically, McClease brings federal claims under 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1985(3) ("Section 1985(3)"), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. His pendent state law claims are for intentional infliction of emotional distress and tortious interference with contract.

Before us are the defendants' motions to dismiss the eight counts of McClease's amended complaint for failure to state claims upon which relief can be granted.[3] As will be seen, these motions require us to consider fundamental, and to date open, questions of at-will employment under federal antidiscrimination law in this Circuit.

### I.  Procedural History

McClease was discharged[4] on or about April 10, 2001.  On January 30, 2002, he

---

1. The amended complaint, as well as the plaintiff's subsequent pleadings, refer to defendant Donnelley as "Donnelly." This spelling is incorrect, and we will not use it in this opinion. By separate Order, we have amended the caption to reflect the proper spelling.

2. Source One, a temporary employment agency, placed McClease at the Levittown facility. Am. Compl. ¶ 11. We infer from the amended complaint that none of the defendants ever employed McClease directly. See Am. Compl. ¶¶ 103, 129, 145, 166 (alleging that the plaintiff "aspired" to enter into an "oral employment contract" with the defendants).

3. In resolving a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), we look only to the facts alleged in the complaint and its attachments. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994). We accept as true all factual allegations in the complaint, and we draw all reasonable inferences therefrom in the light most favorable to the non-movant. General Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 325 (3d Cir.2001). Although we need not accept as true "unsupported conclusions and unwarranted inferences," we must deem the complaint to have alleged sufficient facts if it adequately provides the defendants with notice of the essential elements of the plaintiff's claims. Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir.2000); Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir.1997). We may dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

4. We are reduced to using the passive voice here because the amended complaint does not specify which defendant actually fired McClease. See Am. Compl. ¶ 29.

filed a dual charge of discrimination with the Pennsylvania Human Relations Commission and the EEOC. Am. Comp. ¶ 3. McClease then filed his original complaint in this case on March 29, 2002. That complaint contained all counts now found in the amended complaint except McClease's Title VII claims.

The four defendants filed motions to dismiss the original complaint between May 16 and June 7, 2002, and these motions remain pending. On July 22, 2002, the EEOC issued Right to Sue letters covering all four defendants, *id.* and on August 7, 2002, McClease amended his complaint to include Title VII claims against these defendants. The defendants then filed a new set of motions to dismiss, which differ from the original motions only in that they also seek dismissal of the Title VII claims. We will therefore dismiss the original set of motions as moot and focus our attention on the motions seeking dismissal of the amended complaint.

## II. *Factual History*

The setting for this case is a parcel distribution facility in Levittown, Pennsylvania, that defendants Donnelley and CTC, a Donnelley subsidiary, owned. For several years, defendant Genco operated the facility under contract with Donnelley. Am. Compl. ¶¶ 8,9. Genco contracted with Source One, a temporary employment agency, to provide workers for the facility. One of those workers was plaintiff Anthony McClease, who began to work at Levittown in October, 2000. *Id.* at ¶ 11.

Around the same time, Genco hired Mike Michniewski as a manager.

The amended complaint alleges that, within a week of his hiring, Michniewski began to subject black employees to an unceasing farrago of racial epithets[5], openly expressed his desire to eliminate blacks from the facility, and, in fact, engineered the dismissal of many black employees. *Id.* at ¶¶ 12, 16–19, 83–86. The amended complaint alleges that CTC manager Mike Smith also made racist comments and colluded with Michniewski in eliminating black employees. *Id.* at ¶¶ 65–71. Another black employee, Glenn Holden, approached members of Donnelley, Genco, and CTC management on various occasions in late 2000 to discuss the hostile work environment at the facility. The work conditions for black employees did not improve.

On January 1, 2001, defendant LRI replaced Genco as operator of the Levittown facility. *Id.* at ¶ 64. Michniewski, however, stayed on as an LRI employee and, according to the complaint, continued to dismiss black workers on the basis of race. *Id.* at ¶ 68–69, 83–86. On several occasions in 2001, racially-charged graffiti appeared on bathroom walls and remained for several days. *Id.* at 56–62. Finally, McClease was discharged around April 10, 2001.

## III. *Discussion*

### A. *The Section 1981 Claims*

Counts One through Four of the amended complaint allege that each defendant violated Section 1981.[6] The defendants ar-

---

**5.** According to the complaint, Michniewski incessantly referred to black employees as "fucking monkeys" and called them a "basketball team." Am. Compl. ¶ 12, 45. Michniewski allegedly did not spare other racial minorities. He referred to Hispanic workers as "the Perch" (a term whose meaning eludes us) and stated "I'm going to fire all these fucking monkeys and get a bunch of Orientals. I know they stink, but they piss on

themselves instead of going to the bathroom, just to get the job done." *Id.* at ¶¶ 15, 80. After Asian workers were hired, Michniewski allegedly told the plaintiff, "There are so many gooks in here we could make a war movie." *Id.* at ¶ 33.

**6.** Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and

gue that we must dismiss these claims because defendants never entered into a contractual relationship with McClease, who worked at the facility pursuant to Genco and LRI's contracts with Source One and thus no defendant ever directly employed him.

Despite the fact that many businesses in America rely on temporary staffing agencies to supply their workers, there are surprisingly few reported decisions on whether "temps" enjoy the protection of Section 1981 when the client firms engage in invidious discrimination.[7] There is, however, nothing inherent in the relationship between temporary workers and the firms receiving their services that insulates those firms from Section 1981 liability.

McClease claims that each defendant committed two distinct violations of Section 1981. First, the amended complaint alleges that the defendants promised McClease that he was eligible for "permanent full-time employment" under an "oral employment contract" but then deprived him of this opportunity on the basis of race. Am. Compl. ¶¶ 101–104, 127–128, 143–144, 164–165. These claims come within the scope of Section 1981, which expressly prohibits discrimination in the "making" of contracts. As the Supreme Court has observed, Section 1981 "prohibits, when based on race, the refusal to enter into a contract with someone...." *Patterson v. McLean Credit Union*, 491 U.S. 164, 176–77, 109 S.Ct. 2363, 105

L.Ed.2d 132 (1989); *accord Allen v. Washington Hospital*, 34 F.Supp.2d 958, 960 (W.D.Pa.1999) (hospital's failure, with discriminatory motive, to provide doctor with application for staff position was actionable under Section 1981).

■ Second, McClease avers that the defendants terminated him on the basis of race.[8] *Id.* at ¶ 29, as incorporated by ¶¶ 88, 108, 134 and 151. Although the amended complaint does not detail the relationship between McClease and Source One, we infer from McClease's allegations concerning the harm he has suffered that the dismissal disrupted either his contractual or employment relationship with Source One. *Id.* at ¶¶ 107, 132, 148, 169 (alleging pecuniary losses). If the dismissal interfered with a purely contractual relationship between McClease and Source One, then these claims are actionable under Section 1981. A third party incurs Section 1981 liability for intentionally interfering, on the basis of race, with another's right to make and enforce contracts. *See, e.g., Pryor v. Nat'l Collegiate Athletic Ass'n*, 153 F.Supp.2d 710, 718 n. 8 (E.D.Pa. 2001), *rev'd in part on other grounds*, 288 F.3d 548 (3d Cir.2002); *Cimino v. Delaware Dept. of Labor*, No. 01–458, 2002 WL 265095 (D.Del. Feb.25, 2002).

If, however, McClease was an at-will employee of Source One, it is less clear whether he states a claim under Section 1981. In recent years, a number of cases

Territory to make and enforce contracts ... as is enjoyed by white citizens...." The Civil Rights Act of 1991 amended Section 1981 by providing that the term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

**7.** The only such case we have found is *Hackett v. United Parcel Service*, 1999 WL 33134347 (N.D.Ala.1999) (Johnson, J.).

**8.** Clearly, such a claim is not viable against defendant Genco because it ceased operations at the Levittown facility four months before McClease's dismissal in April 2001. Genco could conceivably incur Section 1981 liability only under the first theory of liability articulated in the amended complaint, *i.e.,* offering McClease the prospect of full-time employment and then denying it on the basis of race.

have examined whether an employee at-will, who can be discharged at any time for almost any cause, is the party to a "contract" within the meaning of Section 1981. Because our Court of Appeals has not ruled on this question, we must address it at some length here.

The problem of at-will employees' access to Section 1981 arises from the fact that the statute does not define the term "contract," and state courts have adopted a variety of views on whether employment at-will is contractual in nature. While some state courts view employment at-will as a contractual relationship terminable by either party, other state courts draw an implicit distinction between contractual and at-will employment. *Compare Melnick v. State Farm Mut. Auto. Ins. Co.*, 106 N.M. 726, 730, 749 P.2d 1105 (1988) *with Jackson v. Georgia–Pacific Corp.*, 296 N.J.Super. 1, 685 A.2d 1329, 1334 (N.J.Super.A.D.1996).

To date, five federal courts of appeals have held that at-will employment constitutes a "contract" within the meaning of Section 1981, but they have taken very different routes to this conclusion.[9] Two of the five circuits defined the term "contract" by reference to state law. *Skinner v. Maritz, Inc.*, 253 F.3d 337, 340 n. 1, 342 (8th Cir.2001) (deferring to Missouri law but also noting that to exclude at-will employees from Section 1981 protection would subvert Congress's intent and "open a gateway for employers to harbor a community of employees to which the federal employment discrimination laws could not apply."); *Perry v. Woodward*, 199 F.3d 1126, 1133 (10th Cir.1999). Three circuits declined to rely exclusively on state law,

even though they made reference to the relevant state law. Instead, they first concluded that Section 1981 requires uniform federal interpretation and then determined that employment at-will is sufficiently contractual to come within the scope of the statute. *Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 261–62 (2d Cir.2000); *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th Cir.1999); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1051–52 (5th Cir.1998).

■ Both the relevant Supreme Court authority and the legislative history of Section 1981 convince us that Section 1981's scope should not be dependent on state law and, further, that Section 1981 covers employment at-will.

We begin with the premise that "in the absence of a plain indication to the contrary, ... Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (quoting *Jerome v. United States*, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943)). This presumption in favor of uniform federal interpretation yields to Congress's intention to create a statutory scheme whose operation varies from state to state, and state law "may also be adopted as the federal rule if necessary to preserve intrastate rule uniformity, to accommodate the interests of states more generally, or if nationwide uniformity is not important." Joanna L. Grossman, *Making a Federal Case Out of It: Section 1981 and At–Will Employment*, 67 Brook. L.Rev. 329, 348–49

---

**9.** In dictum, the Seventh Circuit has observed that the discriminatory discharge of an at-will employee is not actionable under Section 1981 because, even if at-will employment is contractual, it is a contract with no fixed duration. *Gonzalez v. Ingersoll Milling Mach.*

*Co.*, 133 F.3d 1025, 1034–35 (7th Cir.1998). We do not find this approach helpful because it fails to take into account Section 1981(b)'s express prohibition of discrimination in the termination of contracts.

(2001). Section 1981 does not, however, implicate any of these concerns.

Indeed, the legislative history of this statute points away from deference to state law. Congress initially enacted Section 1981 to protect former slaves from discriminatory state laws, and Congress amended Section 1981 in 1991 with the awareness that the statute had emerged in the 1970s as an important source of civil rights protection in employment. See *id.* at 331–32 (discussing early history of Section 1981; H.R. 102–40(II), at 69, *reprinted in* 1991 U.S.C.C.A.N. 694, 755 (describing use of Section 1981 to combat employment discrimination after *Johnson v. Railway Express Agency Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)). We would subvert Congress's aims in enacting and amending Section 1981 if we insisted that the scope of employee's civil rights depends on the vagaries of state employment law.

Moreover, the Supreme Court has suggested that Section 1981's scope does not hinge on state contract law. In *Patterson v. McLean Credit Union, supra,* the Solicitor General argued that the Court should rely on state law in interpreting the term "make and enforce" in Section 1981. 491 U.S. at 182, 109 S.Ct. 2363. The Court declined to adopt the view that Section 1981 "has no actual substantive content, but instead mirrors only the specific protections that are afforded under the law of contracts of each state." [10] *Id.* at 182, 109 S.Ct. 2363.

■ Having concluded that we need not defer to Pennsylvania law in defining the term "contract," we next examine whether,

as a matter of statutory interpretation, employment at-will is sufficiently contractual to come within the scope of this statute. In interpreting basic legal terms that appear in federal statutes, courts frequently rely on treatises, Restatements of Law, and common law decisions. *See, e.g., Lauture,* 216 F.3d at 262 (relying on the Restatement (Second) of Contracts in considering the contractual nature of employment at-will). These sources, however, offer a variety of views on the nature of employment at-will and provide no conclusive answers. Grossman, *supra,* at 358–63. Rather than pick and choose among them, we turn to the legislative history of Section 1981 to determine what meanings Congress attached to the term "contract" when it amended the statute in 1991.

Every appellate court that has examined the legislative history of the 1991 statute has concluded that Congress intended the term "contract" to encompass at-will employment. *See Skinner,* 253 F.3d at 340; *Lauture,* 216 F.3d at 263–64; *Spriggs,* 165 F.3d at 1019; *Fadeyi,* 160 F.3d at 1050. We note, as an illustration, that the Report of the House Education and Labor Committee casually but clearly assumed that all employment relations are contractual in nature. It observed that prior to *Patterson,* "every federal court of appeals had held that section 1981 prohibits not just discrimination at the formation of an employment contract, but discrimination during the performance of that contract as well." H.R.Rep. No. 102–40(I), at 90, *reprinted in* 1991 U.S.C.C.A.N. 549, 628. The Report supported this proposition with the citation of a dozen lower court

---

**10.** To be sure, one of Congress's goals in amending Section 1981 was to overrule *Patterson.* However, the portion of *Patterson* that drew Congress's ire was the Court's holding that Section 1981 only implicates discriminatory conduct in the formation of contracts. Nothing in the legislative history of the Sec-

tion 1981 amendments even acknowledges the portion of the Court's opinion we rely upon. There is no reason to conclude that *Patterson* does not continue to reflect the Court's approach to the meaning of the term "contract" for purposes of interpreting Section 1981.

decisions, many of them involving at-will employees. *Id.* at 90 n. 89.

The Report later stated that the amendments to Section 1981 "would restore protection under federal law against harassment and other forms of intentional discrimination in the terms and conditions of employment for the more than 11 million employees in firms that are not covered by Title VII." *Id.* at 92. This statement draws no distinction between workers who are employees at-will and those with employment contracts. While the Committee's Report might not garner high marks in a law school exam (given its failure to acknowledge the existence of the debate over the nature of employment at-will), it nevertheless shows that, in amending Section 1981, Congress intended the term "contract" to include employment relations without regard to their precise terms and conditions. *Accord* H.R. 102–40(II), at 75, *reprinted in* 1991 U.S.C.C.A.N. 694, 761; S.Rep. No. 101–315, at 14 (1990), *quoted in Skinner,* 253 F.3d at 340 n. 1.

We therefore conclude that even if McClease was an at-will employee of Source One, he was in a contractual relationship within the meaning of Section 1981. The defendants' alleged interference with that contract, therefore, is actionable under the statute.

### B. *The Section 1985(3) Claim*

The defendants also seek dismissal of McClease's Section 1985 claim.

■■ McClease responds that Section 1985(3) imposes liability on private parties who engage in a conspiracy to violate Section 1981. Our Court of Appeals, however, has cast grave doubt on the merits of this argument after a careful examination of Supreme Court decisions on the scope of private party liability under this statute. *See Brown v. Philip Morris, Inc.,* 250 F.3d 789, 805–06 (3d Cir.2001) (noting that the "great weight of precedential authority" supports the view that Section 1985(3) protects only the right to interstate travel and the right to be free from involuntary servitude but declining to decide the issue because the plaintiffs failed to state a claim under Section 1981). Our colleague, Judge Bartle, recently concluded that *Brown* precludes plaintiffs from asserting a claim under Section 1985(3) based on a violation of Section 1981. *Harden v. RR Donelly* [*sic* ], No. 01–6147, 2002 U.S. Dist. LEXIS 12124, at * 4–6 (E.D.Pa. Apr. 1, 2002). We agree with Judge Bartle's analysis of *Brown* 's impact, and we therefore will dismiss Count Five of the amended complaint.

### C. The Intentional Infliction *of Emotional Distress Claim*

■■ The defendants also seek dismissal of McClease's state law claim for intentional infliction of emotional distress ("IIED"). Pennsylvania law imposes liability on "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ." *Shaner v. Synthes (USA),* 204 F.3d 494, 507 (3d Cir.2000) (quoting *Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745, 753 (1998)). To state a claim, physical harm must accompany the emotional distress. *Armstrong v. Paoli Memorial Hosp.,* 430 Pa.Super. 36, 44–45, 633 A.2d 605 (1993).

The defendants argue that the claim must be dismissed because the plaintiff has failed to allege physical harm. They seem to have overlooked Pennsylvania cases that have held that physical harm includes "ongoing mental . . . and emotional harm." *Id.* at 45 (quoting *Love v. Cramer,* 414 Pa.Super. 231, 238, 606 A.2d 1175 (1992)). McClease's complaint alleges that he has suffered "serious emotional

harm, psychological distress and damage." Am. Compl. ¶ 197.

■ Bearing in mind that the Pennsylvania Supreme Court has not opined on this issue, it is a close question whether McClease has alleged sufficient facts to state a claim for IIED. Viewing the factual allegations in the complaint in the light most favorable to McClease, however, we conclude that he has pleaded sufficient facts to put the defendants on notice of the essential elements on his IIED claim.

The defendants also contend that McClease fails to state an IIED claim because racial harassment and epithets do not constitute "extreme and outrageous conduct." We hesitate to predict that the Pennsylvania Supreme Court would hold that racial epithets and harassment can never be the basis of an IIED claim under Pennsylvania law. The Pennsylvania Supreme Court has never examined this question, and in fact only one published lower court decision has considered whether racial slurs constitute extreme and outrageous conduct. In *Dawson v. Zayre Dept. Stores*, 346 Pa.Super. 357, 499 A.2d 648 (1985), a store employee used a racial epithet during a dispute with a customer over a layaway ticket. The Superior Court held that, given the brevity of the encounter and the relationship between the parties, the employee's behavior did not rise to the level of extreme and outrageous conduct. *Id.* at 360, 499 A.2d 648. The panel expressly distinguished the case from those involving "continuous malicious actions" or a "special relationship between the parties." *Id.* at 361–62, 499 A.2d 648 (citing *Bartanus v. Lis*, 332 Pa.Super. 48, 480 A.2d 1178 (1984) and Restatement (Second) of Torts § 48).

The amended complaint here alleges both continuous malicious conduct and a special relationship between the parties. Before we can determine whether the defendants' alleged conduct is extreme and outrageous, McClease should have the chance to develop the factual record of his case. We therefore deny the defendants' motions to dismiss Count Six of the amended complaint.

### D. *The Tortious Interference with Contract Claim*

■ Count Seven of the amended complaint seeks damages for tortious interference with contract. McClease alleges that the defendants perpetuated a racially hostile environment in an attempt to force African–American workers to leave their jobs. To state a claim for tortious interference with contract, McClease must identify (1) an existing contractual relationship between him and a third party; (2) the defendant's intentional and improper interference with the performance of that contract by inducing or otherwise causing the third party not to perform; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual pecuniary harm as a result of the breach of the contract. *Al Hamilton Contracting Co. v. Cowder*, 434 Pa.Super. 491, 497, 644 A.2d 188 (1994).

■ The defendants argue that McClease has failed to state a claim because he cannot identify the existence of a contract between him and a third party. As we have already noted, however, we infer from the amended complaint that McClease enjoyed either a contractual or employment relationship with Source One. If he had a contract with Source One, then he has stated a claim for tortious interference. If McClease was an employee of Source One, we predict, based on our review of Pennsylvania law, that the state Supreme Court would hold that he has stated a claim. *Yaindl v. Ingersoll–Rand Co.*, 281 Pa.Super. 560, 575 n. 6, 422 A.2d 611 (1980) (quoting Restatement (Second) of Torts § 766 cmt. g and noting in dictum

that an at-will employee can bring suit for intentional interference with contract).[11]

■ Defendant Donnelley next contends that McClease's tortious interference with contract claim is pre-empted by Section 1981 and Title VII. It argues that because (1) the Pennsylvania Human Relations Act ("PHRA") pre-empts factually-related common law claims, and (2) "the legal standards applied in PHRA cases and Title VII and § 1981 cases are interchangeable," we must conclude that these federal statutes pre-empt McClease's tortious interference with contract claim. This argument is without merit. Federal pre-emption analysis is an inquiry into whether a particular federal statute displaces another statute or common law doctrine. The pre-emptive effects of the PHRA on Pennsylvania common law shed no light on whether Title VII and Section 1981 pre-empt a pendent claim for tortious interference with contract.

For these reasons, McClease has stated a claim against defendants Donnelley, CTC, and LRI. McClease has, however, failed to state a claim for tortious interference with contract against defendant Genco, which ceased operating at the Levittown facility months before his dismissal in April 2001.

### E. *The Title VII Claim*

■ Finally, the defendants seek dismissal of McClease's Title VII claim. They first argue that the Title VII claim must be dismissed because the EEOC failed to serve them with a notice of charge before the initiation of this suit, as 42 U.S.C. § 2000e–5(b) requires.

Even if the EEOC failed to comply with the statute, McClease has still stated a claim under Title VII. The only jurisdictional prerequisites to a Title VII claim are (1) the filing of charges with the EEOC and (2) receipt of the EEOC's notice of the right to sue. *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir. 1976). McClease has satisfied both requirements. As courts have held for decades, "[a] Title VII complainant is not charged with the commission's failure to perform its statutory duties." *Russell v. American Tobacco Co.*, 528 F.2d 357, 365 (4th Cir.1975).

■ Second, defendant Genco argues that the Title VII claim against it must be dismissed because McClease failed to file

---

**11.** We note that a more recent decision of the Pennsylvania Superior Court has cast doubt on *Yaindl* and held instead that "an action for intentional interference with performance of a contract in the employment context applies only to interference with a prospective employment relationship whether at-will or not, not a presently existing at-will employment relationship." *Hennessy v. Santiago*, 708 A.2d 1269, 1279 (Pa.Super.1998). We predict that the Pennsylvania Supreme Court would adopt *Yaindl* rather than *Hennessy*. In *Yaindl*, the Superior Court based its analysis on the Restatement (Second) of Torts § 766 cmt. g, which provides:

A similar situation [of actionable third-party interference] exists with a contract that, by its terms or otherwise, permits the third person to terminate the agreement at will.

Until he has so terminated it, the contract is valid and subsisting, and the defendant may not improperly interfere with it. The fact that the contract is terminable at will, however, is to be taken into account in determining the damages that the plaintiff has suffered by reason of its breach.

The Pennsylvania Supreme Court has long endorsed Section 766. *See, e.g., Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 207, 412 A.2d 466 (1979). We can find no reason to expect that the Court would reject comment g, which is a logical application of the general principles enunciated in Section 766. *Cf. Buckwalter v. Parker*, 1998 WL 195701, at * 1 (E.D.Pa.1998) (Van Antwerpen, J.) (disagreeing with rule announced in *Hennessy* but predicting that the Pennsylvania Supreme Court would adopt it).

his EEOC charge within 300 days, as 42 U.S.C. § 2000e–5(e) mandates. The last possible date on which Genco could have contributed to the alleged hostile work environment at the Levittown facility was December 31, 2000, when its contract with Donnelley expired. Am. Compl. ¶ 64. McClease, therefore, should have filed a charge against Genco by October 27, 2001. Instead, he did not file until January 30, 2002, almost ninety days too late.

McClease responds by invoking the principle, which the Supreme Court recently endorsed, that a hostile work environment claim is not time-barred "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2077, 153 L.Ed.2d 106 (2002). This doctrine assumes that the defendant is responsible for all the acts that contributed to the hostile work environment. Had Genco continued to operate at the Levittown facility, *Morgan* would authorize us to consider acts that occurred before the 300–day statutory period. We would, however, subvert Title VII's provision of a statutory filing period if we relied on acts occurring after Genco left the facility to determine when McClease's 300–day filing period began. Genco's motion in this respect is therefore meritorious.

## IV. *Conclusion*

For the foregoing reasons, we deny the defendants' motions to dismiss Counts One through Four of the amended complaint. We dismiss Count Five with prejudice. We deny the defendants' motions to dismiss Count Six, and we dismiss Counts Seven and Eight as to Genco but not as to the other defendants.

### ORDER

AND NOW, this 9th day of October, 2002, upon consideration of defendants' motions to dismiss (docket nos. 6, 9, 10, 19, 21, and 34) and the responses thereto, and in accordance with the foregoing Memorandum, it is hereby ORDERED that:

1. The motions to dismiss filed May 16, 2002; May 28, 2002; and June 7, 2002 (docket nos. 6, 9, and 10) are DENIED AS MOOT; and

2. The remaining motions to dismiss (docket nos. 19, 21, and 34) are GRANTED IN PART, in that:

(a) Count Five is DISMISSED WITH PREJUDICE as to all defendants;

(b) Counts Seven and Eight are DISMISSED WITH PREJUDICE as to defendant Genco Corporation only; and

(c) In all other respects, the motions are DENIED.