## Polito v. AOL Time Warner Inc.

C.P. of Lackawanna County, no. 03 CV 3218.

*Terrence J. McDonald,* for plaintiff.
*Carrie Davis, senior paralegal,* for defendant.

NEALON, *J.,* January 28, 2004—The recipient of harassing electronic communications from pseudonymous authors seeks to compel an internet service provider to reveal the identities of its anonymous subscribers who have transmitted the offensive e-mails and

instant messages. Based upon the material submitted for review, the requesting party has established that: (1) she has a prima facie basis for asserting criminal or civil liability against the culpable authors; (2) the identifying information is relevant to her claims and necessary to obtain redress; (3) she is seeking the information in good faith and not for some improper purpose; and (4) she is unable to obtain the identifying information by alternative means. Therefore, she is entitled to discover the identities of the anonymous subscribers provided that the internet service provider first notifies the anonymous subscribers in advance to afford them the opportunity to oppose the disclosure of their identities.

## I. FACTUAL BACKGROUND

Plaintiff Michele Polito has filed this action against defendant AOL Time Warner Inc. seeking the identities of AOL subscribers who have forwarded "harassing . . . pornographic, embarrassing, insulting, annoying and . . . confidential" electronic communications to her via the internet. (Dkt. entry no. 1, ¶4.) The anonymous individuals transmitting the abusive e-mails and instant messages to Polito use multiple screen names which they frequently change, thereby preventing Polito from permanently blocking her receipt of these harassing communications. Polito has changed her own screen name in an effort to avoid receipt of these communications, but the anonymous authors have inexplicably obtained her new screen names and resumed their harassment. (*Id.*, ¶¶6-7.) Although Polito has asked AOL to identify the account holder(s) for the offending screen names, AOL has indicated that it will "only provide said information upon a court order." (*Id.*, ¶12.)

Hence, Polito commenced this action on August 1, 2003, and secured a rule to show cause why AOL should not be compelled to release the requested information. (Dkt. entry no. 2.) Following its receipt of the rule to show cause, AOL forwarded correspondence to the anonymous subscribers in question advising them of Polito's lawsuit and stating:

"As set forth in our terms of service, it is AOL's policy to protect the privacy of its members to the fullest extent consistent with its obligations under law. The terms of service state: 'We will release specific information about your account only to comply with valid legal process such as a search warrant, subpoena or court order . . . .'

"It is AOL's policy to require service of a valid legal process before it will disclose member identity information. Pursuant to AOL's policy, we promptly notify the member(s) whose information is sought so that the member whose information is sought will have adequate opportunity to pursue any legal remedy that may be available.

"Please note that the date of the rule to show cause is returnable for August 21, 2003.

"A copy of the rule to show cause is enclosed." (Dkt. entry no. 4, exhibit B.)

No counsel acting on behalf of the anonymous subscriber(s) has entered an appearance of record nor has any response to the rule been filed by AOL, or the subscribers. Oral argument on Polito's request was conducted on January 7, 2004, at which time only Polito's counsel appeared.

Polito seeks to discover the identities of the AOL subscribers who utilize the screen names "Chazz49787," "Scrantonpd4life," "ScrantOnpd4life," "PandorasBox," "DunmoreBucks1998," "gwhunt316" and "MICNIC 1810." In her supporting brief, Polito contends that the subscribers' "privacy rights" do not bar disclosure of their identities since "[t]he communicators purposely and willfully contacted [Polito] using misleading and wrongful tactics." (Dkt. entry no. 4, p. 6.) According to Polito, the offending subscribers waived their constitutional rights by initiating the internet contact with her. (*Id.* at pp. 6-7.) Polito seeks to compel disclosure of the subscribers' identities in order to pursue legal action against them and to discontinue any further electronic communications from them. (Dkt. entry no. 1, 1117-18.)

## II. DISCUSSION

### (A) *First Amendment Right to Anonymous Speech*

Although Polito has framed the issue as one involving the subscribers' constitutional "right of privacy," see *Commonwealth v. Proetto,* 771 A.2d 823, 830-31 (Pa. Super. 2001) (defendant did not have a legitimate expectation of privacy in chat-room conversations and e-mails with a minor containing obscene and sexual photographs and information), *aff'd,* 575 Pa. 511, 837 A.2d 1163 (2003), her request more directly implicates the anonymous declarants' free speech rights under the First Amendment to the United States Constitution. See Morris, *First Amendment Issues on the Internet—The Right to Speak Anonymously,* 2 Internet Law & Practice §24:29 (2003). The First Amendment restricts the ability of the

government to interfere with an individual's freedom of speech and that limitation is applicable to the states by virtue of the Fourteenth Amendment. See *First National Bank v. Bellotti,* 435 U.S. 765, 779-80 (1978). A court order which is issued at the request of a private party in a civil law suit constitutes state action that is subject to the constitutional limitations set forth in the First Amendment. *Doe v. 2TheMart.com Inc.,* 140 F. Supp.2d 1088, 1091-92 (W.D. Wash. 2001) (citing *New York Times Co. v Sullivan,* 376 U.S. 254, 265 (1964)).

A component of the First Amendment right to freedom of speech is the right to speak with anonymity. See *e.g., Watchtower Bible and Tract Society of New York Inc. v. Village of Stratton,* 536 U.S. 150, 167-68 (2002) (ordinance requiring individuals to obtain permits containing their names before engaging in door-to-door political advocacy and to display the permits upon demand violated First Amendment anonymous speech rights); *Buckley v. American Constitutional Law Foundation Inc.,* 525 U.S. 182, 200 (1999) (invalidating, on First Amendment grounds, statute requiring initiative petition circulators to wear identification badges); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 357 (1995) (statute prohibiting distribution of political literature without distributor's name and address was violative of First Amendment right to anonymous speech); *Talley v. California,* 362 U.S. 60, 65 (1960) (striking statute which barred distribution of handbills that did not contain the preparer's name and address). As the Supreme Court of Pennsylvania recently observed, "[t]here is no question that generally, the constitutional right to anonymous free speech is a right deeply rooted in public policy that goes beyond this particular

litigation, and that it falls within the class of rights that are too important to be denied review." *Melvin v. Doe,* 575 Pa. 264, 278, 836 A.2d 42, 50 (2003).

The cyclopean growth of the internet and the corresponding proliferation of electronic communication have created challenging legal issues under existing constitutional jurisprudence. See Strickland, *Applying McIntyre v. Ohio Elections Comm'n to Anonymous Speech on the Internet and the Discovery of John Doe's Identity,* 58 Wash. & Lee L.Rev. 1537, 1582 (fall 2001) ("Although the *McIntyre* court recognized a respected tradition of anonymity in the advocacy of political causes, the court did not consider unlawful, anonymous speech; consequently, the *McIntyre* case is not fully applicable to the cybersmear context."); Sanford & Lorenger, *Teaching an Old Dog New Tricks: The First Amendment in an Online World,* 28 Conn. L. Rev. 1137, 1154 (summer 1996) ("But how current laws regulating defamation and protecting core First Amendment values will be applied—or should be applied—to cyberlibel is yet unknown."). "The near universal use of pseudonyms in e-mail and instant messages has fostered a culture in which users are freed to say and do things they never would by offline means." Fink, *The Name Behind the Screen Name: Handling Information Requests Relating to Electronic Communications,* 19 no. 11 Computer & Internet Law 1 (Nov. 2002). By using a screen name, an anonymous user "is able to create an entirely new persona for his internet communications, based on the distinction that 'unlike real space, cyberspace reveals no self-authenticating facts about identity.'" O'Brien, *Putting a Face to a (Screen) Name: The First Amend-*

*ment Implications of Compelling ISPs to Reveal the Identities of Anonymous Internet Speakers in Online Defamation Cases,* 70 Fordham L. Rev. 2745, 2746 (May 2002). As a result, "the internet has created the ability to commit certain tortious acts such as defamation, entirely online," *Rocker Management LLC v. John Does 1-20,* 2003 WL 22149380, *1 (N.D. Cal. 2003), and "[p]arties who have been injured by these acts are likely to find themselves chasing the [anonymous] tortfeasor from internet service provider (ISP) to ISP . . . ." *Columbia Ins. Co. v. Seescandy.com,* 185 F.R.D. 573, 576 (N.D. Cal. 1999).

Other jurisdictions have considered whether the constitutional right to speak anonymously extends to electronic speech via the internet. In each instance, the court has concluded that the right to communicate anonymously on the internet falls within the ambit of the First Amendment's protections. See *e.g., LaSociete Metro Cash & Carry France v. Time Warner Cable,* 2003 WL 22962857, *5 (Conn. Super. 2003); *2TheMart.com Inc.,* 140 F. Supp.2d at 1092; *In re Subpoena Duces Tecum to America Online Inc.,* 2000 WL 1210372, *6 (Va. Cir. Ct. 2000), *rev'd on other grounds, America Online Inc. v. Anonymously Publicly Traded Co.,* 261 Va. 350, 542 S.E.2d 377 (2001). See also, O'Brien, 70 Fordham L. Rev. at 2745 ("anonymity is an essential tool in protecting free speech and action on the internet, even if accountability is marginally diminished."). However, those same courts have uniformly held that the right to speak anonymously on the internet is not absolute. *Immunomedics Inc. v. Doe,* 342 N.J. Super. 160, 165-66, 775 A.2d 773, 776-77 (2001); *2TheMart.com Inc.,* 140

F. Supp.2d at 1093. Cf. *SPX Corp. v. Doe,* 253 F. Supp.2d 974, 981-82 (N.D. Ohio 2003) (cautioning that there is no blanket protection from defamation liability for anonymous statements made on an internet message board). Therefore, while the anonymous subscribers in this case clearly have a First Amendment right to anonymous speech on the internet, that right is subject to limitation.

## (B) *Standard for Disclosure*

A corollary to the precept that the right to speak anonymously is not absolute is the principle that the First Amendment is not intended to protect unconditionally all forms of expression. See *Roth v. United States,* 354 U.S. 476, 483 (1957) (obscenity is not protected by the First Amendment); *Beauharnais v. Illinois,* 343 U.S. 250, 266 (1952) (libelous statements are outside the realm of constitutionally protected speech); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 573 (1942) (First Amendment protections do not extend to "fighting words"). Clearly those "[p]eople who have committed no wrongdoing should be free to participate in online forums without fear that their identity will be exposed under the authority of the court." *2TheMart.com Inc.,* 140 F. Supp.2d at 1092. But, if an anonymous internet speaker engages in tortious or criminal conduct, "[t]he protection of the right to communicate anonymously must be balanced against the need to assure that those persons who choose to abuse the opportunities presented by this medium can be made to answer for such transgressions." *America Online, supra* at *6.

The paucity of reported decisions which have analyzed the scope of the right to anonymous speech on the internet have addressed that question in the context of anony-

mous posting of defamatory remarks or proprietary information on websites and message boards or in online chat rooms. Those courts have endeavored to strike an appropriate balance between the declarant's right to speak anonymously and the victim's right to assert a cognizable claim against a discernible defendant in order to obtain redress for an actionable wrong. See Ekstrand, *Unmasking Jane and John Doe: Online Anonymity and the First Amendment,* 8 Comm. L.&Pol'y 405 (autumn 2003) ("Courts are finding that anonymous speech on the internet is worthy of protection and that unmasking a defendant's identity requires (1) evidence of a valid case, (2) a showing of good faith by the plaintiff and (3) sufficient justification for revealing the identity of the anonymous poster."). Their efforts in that regard have yielded a series of multi-factor tests comprised of relatively diverse criteria. See Sunkel, *And the I(SP)s Have It . . . But How Does One Get It? Examining the Lack of Standards for Ruling on Subpoenas Seeking to Reveal the Identity of Anonymous Internet Users in Claims of Online Defamation,* 81 N.C. L. Rev. 1189, 1218 (March 2003) (advocating that internet service providers follow the same standard which governs a journalist's disclosure of anonymous sources since "[b]oth analyses require a careful balancing of the right to speak anonymously and the potential chill if this right is infringed against the right for a plaintiff to have all relevant evidence when proceeding with litigation."); Decoste, *Sender Beware: The Discoverability and Admissibility of E-Mail,* 2 Vand. J.Ent. L.&Prac. 79, 80 (winter 2000) ("Faced with a dearth of authority on point, judges have frequently drawn legal analogies between electronic media and classic forms of evidence, such as paper documents.").

In *America Online,* the Circuit Court of Virginia concluded that an internet service provider should be required to produce information concerning the identity of a subscriber only if (1) the pleadings or evidence satisfy the court "that the party requesting the subpoena has a legitimate, good faith basis to contend that it may be the victim of conduct actionable in the jurisdiction where suit was filed" and (2) "the subpoenaed identity information is centrally needed to advance that claim." *America Online,* 2000 WL 1210372 at *8. The *America Online* court reasoned that "[t]hose who suffer damages as a result of tortious or other actionable communications on the internet should be able to seek appropriate redress by preventing the wrongdoers from hiding behind an illusory shield of purported First Amendment rights." *Id.* at *6. Thus, it concluded that the compelling state interest in protecting residents "from the potentially severe consequences that could easily flow from actionable communications on the information superhighway significantly outweighs the limited intrusion on the First Amendment rights of any innocent subscribers."[1] *Id.* at *8.

The Washington federal court in *2TheMart.com Inc.* formulated a more demanding standard which requires the court to consider "whether: (1) the subpoena seeking the information was issued in good faith and not for any improper purpose, (2) the information sought relates to

___

1. The Circuit Court permitted the plaintiff to proceed anonymously under the pseudonym of "Anonymously Publicly Traded Company," but, on appeal, the Supreme Court of Virginia reversed and held that the plaintiff corporation should not have been allowed to proceed anonymously in seeking the subpoena duces tecum. See *America Online Inc. v. Anonymously Publicly Traded Company,* 261 Va. 350, 364-65, 542 S.E.2d 377, 385 (2001).

a core claim or defense, (3) the identifying information is directly and materially relevant to that claim or defense, and (4) information sufficient to establish or to disprove that claim or defense is unavailable from any other source." *2TheMart.com Inc.,* 140 F. Supp.2d at 1095, 1097. The New Jersey courts have likewise developed a four-part test, albeit with different elements than the *America Online Inc.* and *2TheMart.com. Inc.* approaches. Under the New Jersey analysis, the identity of an anonymous internet speaker is discoverable only if: (1) the plaintiff has undertaken efforts to notify the anonymous speakers about the application for an order of disclosure so as to afford the anonymous declarant "a reasonable opportunity to file and serve opposition to the application"; (2) the plaintiff identifies the exact statements purportedly made by the anonymous speaker which the "plaintiff alleges constitutes actionable speech"; (3) the plaintiff "has set forth a prima facie cause of action" against the anonymous speaker which "can withstand a motion to dismiss for failure to state a claim upon which relief can be granted"; and (4) the court has balanced the declarant's "First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous [speaker's] identity to allow the plaintiff to properly proceed." *Dendrite International Inc. v. Doe,* 342 N.J. Super. 134, 141-42, 775 A.2d 756, 760-61 (2001). Accord, *Immunomedics Inc.,* 342 N.J. Super. at 165-66, 775 A.2d at 776-77. The Superior Court of Connecticut has adopted a standard which is a hybrid of the Virginia, Washington and New Jersey approaches and requires the party seeking discovery to establish that: (1)

"there is probable cause that [plaintiff] has suffered damages as the result of the tortious acts" of the anonymous speaker; (2) plaintiff "is seeking information regarding [the] identity in good faith and not for any improper purpose"; (3) "the information is limited in scope and is directly related to the plaintiff's cause of action"; and (4) "the plaintiff has no other adequate means of obtaining such information." *LaSociete Metro Cash & Carry France,* 2003 WL 22962857 at *7.

In the only reported Pennsylvania case addressing this issue, Allegheny County Judge R. Stanton Wettick Jr. considered "whether the First Amendment protects the anonymity of the person or persons who anonymously published an allegedly defamatory statement on an internet website after the plaintiff has made a prima facie showing that the statement was false, that the statement was defamatory, and that she has sustained harm that would support a monetary award." (footnote omitted) *Melvin v. Doe,* 49 D.&C.4th 449, 450 (Allegheny Cty. 2000), *appeal quashed,* 789 A.2d 696 (Pa. Super. 2001), *vacated and remanded,* 575 Pa. 264, 836 A.2d 42 (2003). In *Melvin,* a Superior Court judge filed a defamation action against anonymous defendants who had posted statements on a website accusing the judge of political activity and lobbying in connection with the gubernatorial appointment of a common pleas judge. In determining whether the plaintiff could discover the identity of the person(s) who published the statement, the *Melvin* court noted that "[i]f a plaintiff who has been harmed by allegedly defamatory anonymous speech cannot use the tools provided under state law to learn the identity of the speaker, anonymous internet speech, no

matter how false and injurious, would be outside the scope of civil and criminal law for all practical purposes." *Melvin,* 49 D.&C.4th at 458. Based upon his comprehensive analysis of the relevant constitutional and defamation law, Judge Wettick concluded that a plaintiff seeking such information must first satisfy the threshold requirement "that the complaint on its face set forth a valid cause of action and that the plaintiff offer testimony that will permit a jury to award damages . . . ." *Id.* at 462. In addition, Judge Wettick held that the requesting party must also demonstrate that the identifying "information (1) is material, relevant and necessary, (2) . . . cannot be obtained by alternative means, and (3) . . . is crucial to plaintiff's case." *Id.* at 477. See also, Stiles, *Everyone's a Critic: Defamation and Anonymity on the Internet,* 2002 Duke L. & Tech. Rev. 4, 12 (2002) (describing the *Melvin* standard as a three-part test).

The anonymous defendants in *Melvin* appealed the denial of their motion for a protective order, but the Superior Court quashed their appeal on the grounds that it was not an appealable collateral order under Pa.R.A.P. 313. *Melvin v. Doe,* 789 A.2d 696, 698 (Pa. Super. 2001) (remarking that the anonymous "Appellants concede that the existing state of the law permits a plaintiff to discover the identity of anonymous critics in a case such as this even before the truth or falsity of the challenged statements has been determined."). (footnote omitted) However, the Supreme Court later determined that the *Melvin* discovery ruling was appealable under the collateral order doctrine and vacated the Superior Court's order quashing the appeal. In so holding, it remanded the matter "to the Superior Court for consideration of appellants'

constitutional question, namely, whether the First Amendment requires a public official defamation plaintiff to establish a prima facie case of actual economic harm prior to obtaining discovery of an anonymous defamation defendant's identity." *Melvin v. Doe,* 575 Pa. 264, 278, 836 A.2d 42, 50 (2003).

In light of the pendency of the *Melvin* appeal, Polito's discovery request must be decided without the benefit of any Pennsylvania appellate precedent establishing a definitive standard governing a litigant's attempt to ascertain the identity of an anonymous internet speaker. Nevertheless, we agree with Judge Wettick and the jurists from other jurisdictions that the court must strive to achieve an equitable balance between the anonymous declarant's First Amendment right to speak anonymously and the plaintiff's right to obtain relief for criminal or tortious conduct. Based upon the persuasive reasoning contained in the foregoing case law, we conclude that Polito is entitled to obtain the identity of the AOL subscribers in question provided that she: (1) satisfactorily states a cognizable claim under Pennsylvania law entitling her to some form of civil or criminal redress for the actionable speech of the unknown declarant(s); (2) demonstrates that the identifying information is directly related to her claim and fundamentally necessary to secure relief; (3) is seeking the requested information in good faith and not for some improper purpose such as harassing, intimidating or silencing her critics; and (4) is unable to discover the identity of the anonymous speaker(s) by alternative means. Furthermore, before the internet service provider discloses the anonymous subscribers' identities, it must

notify them in advance to afford them a reasonable opportunity to petition the court to vacate, reconsider or stay the discovery order prior to their identities being revealed. See Sobel, *The Process that "John Doe" is Due: Addressing the Legal Challenge to Internet Anonymity*, 5 Va. J.L. & Tech. 3, 20-21 (2000) (arguing that the service provider must notify the subscriber of the identity request so that [s]he may anonymously object through counsel before any identifying information is disclosed).

### (1) Prima Facie Claim

Polito must first articulate a prima facie basis for imposing civil or criminal liability upon the anonymous speakers. Compare *Immunomedics Inc.,* 342 N.J. Super. at 167, 775 A.2d at 777 (holding that corporation's right to disclosure of internet service user's identity outweighed user's First Amendment right of anonymous free speech since "Immunomedics clearly established a prima facie cause of action for breach of the confidentiality agreement founded on the content of [the screen name's] posted messages.") and *Dendrite International Inc.,* 342 N.J. Super. at 158-59, 775 A.2d at 772 (defamation plaintiff not entitled to discovery of anonymous user's identity because "Dendrite failed to establish a sufficient nexus between John Doe no. 3's statements and Dendrite's allegations of harm."); *Rocker Management L.L.C.,* 2003 WL 22149380 at **2-3 (investment management firm denied access to identity of internet chatroom posters whose postings constituted non-libelous expressions of opinion rather than actionable statements of fact). Polito's filings do not assert a particular

cause of action against the anonymous subscribers.[2] Nevertheless, our independent review of her submissions reflect that she does have a bona fide basis for imposing liability upon the anonymous declarants.

Polito has produced several of the offending e-mails and instant messages which she has received from the aforementioned screen names. Some of these electronic communications contain callous and juvenile remarks regarding her alleged weight and eating habits and her parents' purported economic status. Others include more egregious and inflammatory taunting concerning mental health issues and extremely sensitive private matters. Polito has further averred in her verified petition that some communications were pornographic in nature and have continued unabated despite her repeated requests that they cease.

The unsolicited and anonymous communications in question arguably constitute harassment or stalking by communication under Pennsylvania law. Section 2709 (a) of the Crimes Code states that "[a] person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person . . . communicates to or

---

2. In the decisional precedent discussed *supra,* the party seeking discovery commenced an action against anonymous defendants and thereafter served a subpoena duces tecum upon the non-party ISP to produce information relative to the unknown subscriber. See *e.g., Rocker Management L.L.C., supra; Immunomedics Inc., supra; Dendrite International Inc., supra; Melvin, supra.* However, Polito has instituted a direct action against AOL to compel disclosure of the anonymous subscribers' identities. AOL has not challenged the procedural propriety of Polito's lawsuit or her request for an order compelling disclosure. See *America Online,* 2000 WL 1210372 at *1 n.2 (procedural defect deemed waived where AOL failed to dispute the propriety of the procedure employed by the requesting party).

about such other person any lewd, lascivious . . . or obscene words" or "communicates repeatedly in an anonymous manner." 18 Pa.C.S. §2709(a)(4), (5). The harassment statute defines the term "communicates" as conveying "a message without intent of legitimate communication or address by . . . written or electronic means, including . . . electronic mail, internet, . . . or similar transmissions." 18 Pa.C.S. §2709(f). Polito's documentation indicates that the anonymous subscribers have, with the apparent intent to harass, annoy or alarm, repeatedly communicated with her in an anonymous manner and have transmitted pornographic and salacious information in contravention of 18 Pa.C.S. §2709(a)(4) and (5).[3] See *Commonwealth v. Hendrickson,* 555 Pa. 277, 283-84, 724 A.2d 315, 318 (1999) (rejecting defendant's contention that he could not be convicted of harassment by communication because his communications were anonymous and contained protected speech, and holding that the harassment by communication statute does not punish constitutionally protected speech since it requires repeated anonymous communications with the intent to harass, annoy or alarm). Additionally, the anonymous declarants' actions may be violative of 18 Pa.C.S. §2709(a)(3) which exposes a person to criminal liability if [s]he, with intent to harass, annoy or alarm, "engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose." See *Commonwealth v.*

---

3. The harassment by communication provisions of 18 Pa.C.S. §2709(a)(4) and (5) were formerly found at 18 Pa.C.S. §5504(a)(1) and (2) which was repealed by the Act of December 9, 2002, P.L. 1759, no. 218, section 4, and recodified at 18 Pa.C.S. §2709(a)(4) and (5).

*Lutes,* 793 A.2d 949, 961 (Pa. Super. 2002) ("A course of conduct intended to harass, annoy or alarm a person can be based on words alone.").

The anonymous subscribers may likewise be chargeable with stalking by communication under the Crimes Code. Section 2709.1(a)(2), which was formerly found at 18 Pa.C.S. §5504(a.1) (repealed), provides that a person is guilty of stalking by communication if [s]he "repeatedly communicates to another person under circumstances which demonstrate or communicate . . . an intent . . . to cause substantial emotional distress to such other person." 18 Pa.C.S. §2709.1(a)(2). The stalking by communication statute similarly defines the term "communicates" as "convey[ing] a message without intent of legitimate communication or address by . . . written or electronic means, including . . . electronic mail, internet . . . or similar transmission." 18 Pa.C.S. §2709.1(f). Inasmuch as Polito's materials document repeated communications which manifest an intent to cause substantial emotional distress, Polito has stated a prima facie violation of 18 Pa.C.S. §2709.1(a)(2). See *Commonwealth v. D'Collanfield,* 805 A.2d 1244, 1248-49 (Pa. Super. 2002) (finding that nine e-mail communications of a harassing nature were sufficient to establish intent to cause substantial emotional distress under 18 Pa.C.S. §5504(a.1) (repealed) as "intent may be inferred from the words or actions of the defendant in light of all attendant circumstances.").

From a civil law standpoint, Polito may have a viable claim for intentional infliction of emotional distress (IIED). Although the Supreme Court of Pennsylvania has never expressly recognized a cause of action for IIED, it has cited section 46 of the Restatement (Second) of Torts

(1965) "as setting forth the minimum elements necessary to sustain such a cause of action." *Taylor v. Albert Einstein Medical Center,* 562 Pa. 176, 181, 754 A.2d 650, 652 (2000). To prevail on an IIED claim, a plaintiff must prove that the defendant intentionally or recklessly caused severe emotional distress by its extreme and outrageous conduct. See *e.g., Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1970) (defendant, after striking and killing plaintiff's son with an automobile, and after failing to notify authorities or seek medical assistance, buried dead body in a field where it was discovered two months later and returned to the parents); *Banyas v. Lower Bucks Hospital,* 293 Pa. Super. 122, 437 A.2d 1236 (1981) (defendants intentionally fabricated records to suggest that plaintiff had killed a third party and such fraud led to plaintiff being indicted); *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir. 1979) (defendant released to the media false information that plaintiff was suffering from a fatal disease when the defendant physician knew that such information was untrue). For a tortfeasor's actions to warrant a claim for IIED, "the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone,* 554 Pa. 134, 151, 720 A.2d 745, 754 (1998); *Strickland v. University of Scranton,* 700 A.2d 979, 987 (Pa. Super. 1997).

Comment (d) to section 46 addresses an IIED claim predicated upon offensive speech and states:

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still

in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt." *Kazatsky v. King David Memorial Park Inc.,* 515 Pa. 183, 191, 527 A.2d 988, 991-92 (1987) (quoting Restatement (Second) of Torts §46, comment *d*). See also, *Miller v. Peraino,* 426 Pa. Super. 189, 195-96, 626 A.2d 637, 641 (1993) (veterinarian's statements that dog owner was stupid and that dead dog was fat and ugly like dog owner's wife, and inquiry whether dog owners had made a rug out of dead dog, were not sufficiently atrocious and outrageous to support a claim for IIED). However, comment (f) to section 46 further provides that:

"The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." *Dicks v. Information Technologists Inc.,* 1996 WL 528890, *6 (E.D. Pa. 1996) (quoting Restatement (Second) of Torts §46, comment (f)). Therefore, if the defendant knows that the plaintiff is unusually susceptible or vulnerable to emotional distress due to a mental condition or peculiar sensitivity, the defendant's actions may become sufficiently outrageous if [s]he engages in certain conduct despite such knowledge. See *McClease v. R.R. Donnelley & Sons Co.,* 226 F. Supp.2d 695, 703 (E.D.

Pa. 2002) (discharged African-American employee stated claim for IIED based upon repeated racial harassment and epithets); *Syslo v. Moses Taylor Hospital,* 102 Lacka. Jur. 210, 214 (2000) (verbally berating a patient while she is recuperating from negligently performed surgery by addressing her as an "alcoholic" and a "whore" could constitute extreme and outrageous conduct so as to permit recovery for IIED); *Naughton v. Mercy Hospital,* 4 D.&C.4th 628, 640 (Lacka. Cty. 1989) ("Still another basis on which outrageous conduct can be found from the defendant's behavior is the latter's knowledge that the plaintiff is especially sensitive, susceptible and vulnerable to injury through mental distress from the particular conduct.").

The anonymous subscribers' comments about Polito's parents, habitus and lifestyle are akin to the inconsiderate and unkind remarks that cannot form a basis for IIED liability under comment (d) of section 46. See *Miller, supra.* However, the more appalling statements relating to her fragile mental health and other sensitive issues evince the declarant's knowledge of Polito's peculiar susceptibility to emotional distress as a result of any ridicule with regard to those matters. Thus, the latter communications support a conceivable claim for IIED under comment (f) to section 46. See Davis, *Liability for Infliction of Emotional Distress Peculiar Susceptibility to Distress,* 1 Summ. Pa. Jur.2d Torts §10:25 (2003).

Consequently, prima facie grounds exist for imposing civil or criminal liability upon the pseudonymous speakers in this case. As such, Polito has satisfied the first ele-

ment of the test for disclosure of the anonymous subscribers' identities.

## (2) Relevance and Necessity

Second, the identifying information must be relevant to Polito's claim(s) and necessary for her to proceed forward with those claims. By way of illustration, the corporate defendant in the shareholder derivative action in *2TheMart.com Inc.* sought to obtain the identities of anonymous posters of internet messages in an attempt to support its affirmative defense that the posted messages, rather than corporate fraud, caused a decline in the value of the corporation's stock. While the *2TheMart.com* court agreed that the posted messages were relevant to that affirmative defense, it denied the discovery request on the basis that specific identifying information about the posters was not necessary for the corporation to successfully assert the affirmative defense. *2TheMart.com Inc.,* 140 F. Supp.2d at 1096-97 (quashing subpoena and holding that corporation had "failed to demonstrate that the identity of these internet users is directly and materially relevant to a core defense in the underlying securities litigation.").

In contrast, Polito cannot attempt to secure civil or criminal redress without first ascertaining the identities of the persons to be sued or prosecuted. Simply stated, in order for a civil or criminal action to be commenced and initial process to be served, Polito must determine the identities of the culpable subscribers. Thus, the identifying information is both relevant and necessary for Polito to obtain relief.

### (3) Good Faith Purpose

The record is devoid of any bad faith or ulterior motives on Polito's behalf in seeking the identifying information from AOL. None of the communications in question address political or governmental affairs or other issues of public concern, nor is Polito attempting to silence legitimate critics. Cf. *Talley,* 362 U.S. at 64-65 (noting that anonymous speech served as a powerful instrument for political debate in early American history as evidenced by the Federalist Papers which urged ratification of the Constitution and were anonymously authored by Madison, Hamilton and Jay under the pseudonym "Publius"). The sole purpose of these offensive communications has been to harass and abuse Polito.[4] Since Polito's primary motivation is to obtain relief and terminate the unsolicited revilement, she is seeking the identifying information in good faith.

### (4) Unavailability by Other Means

The Electronic Communication Privacy Act (ECPA), 18 U.S.C. §2701 et seq., and section 551(c) of the Cable Communications Policy Act, 47 U.S.C. §551(c), limit the ability of AOL Time Warner Inc. to release identifying information about its subscribers. See *LaSociete Metro Cash & Carry France,* 2003 WL 22962857 at *1

---

4. The AOL Member Agreement and Rules of the Road prohibit an account holder from "using AOL services to . . . harass, threaten, embarrass, or cause distress, unwanted attention or discomfort upon another member or user of AOL or other person or entity" or to "transmit any unlawful, harmful, . . . abusive, harassing, . . . vulgar, obscene, hateful, . . . or otherwise objectionable content." *Jessup-Morgan v. America Online Inc.,* 20 F. Supp.2d 1105, 1108 (E.D. Mich. 1998).

(47 U.S.C. §551(c)(2)(B) permits a cable operator such as Time Warner to release "personally identifiable information concerning any subscriber if it is made pursuant to a court order authorizing such disclosure [and] if the subscriber is notified of such order by the person to whom the order is directed."); *Jessup-Morgan,* 20 F. Supp.2d at 1108 (AOL's disclosure of subscriber's identity in response to properly executed subpoena did not violate 18 U.S.C. §2703(c)(1)(A)). For that reason, AOL will not release the requested information to Polito absent a valid subpoena, search warrant or court order. (Dkt. entry no. 4, exhibit B.) Polito can only secure the requested information from AOL and she has demonstrated sufficient need for a discovery order.

## III. CONCLUSION

Accordingly, Polito has satisfied the criteria entitling her to an order compelling AOL to divulge the identities of the anonymous subscribers for the seven screen names at issue. We have carefully balanced the subscribers' right to speak anonymously and Polito's right to protect her interests and secure relief, and agree with the New Jersey court that "[a]lthough anonymous speech on the internet is protected, there must be an avenue for redress for those who are wronged." *Immunomedics,* 342 N.J. Super. at 167, 775 A.2d at 777. Internet users who choose to violate the law by transmitting harassing or defamatory communications should not be entitled to conceal their identity and avoid punishment or liability for their actionable conduct. See Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace,* 49 Duke L.J. 855, 887 (2000) (reasoning that the identification of

anonymous declarants who abuse internet discourse will send "a powerful message" to all users that they "should not rely on anonymity to shield them from being sued if they post abusive and untrue messages," and will thereby improve the "quality of speech" on the internet). An appropriate order will follow.

## ORDER

And now, January 28, 2004, upon consideration of the "petition for release of information" presented by plaintiff Michele Polito, and the exhibits and legal authority submitted in support of her petition, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

(1) The "petition for release of information" filed by the plaintiff, Michele Polito, is granted;

(2) Sixty days following the filing of this memorandum and order, AOL Time Warner Inc. shall provide the plaintiff with the identities of its subscribers for the screen names "Chazz49787," "Scrantonpd4life," "ScrantOnpd4life," "PandorasBox." "DunmoreBucks 1998," "gwhunt316" and "MICNIC1810"; and

(3) Upon its receipt of this memorandum and order, AOL Time Warner Inc. shall immediately forward a copy of this memorandum and order to its subscribers for the screen names "Chazz49787," "Scrantonpd4life," "ScrantOnpd4life," "PandorasBox," "DunmoreBucks 1998," "gwhunt316" and "MICNIC1810" in order to afford them a reasonable opportunity to seek to vacate, reconsider or stay the order prior to their identities being disclosed by AOL Time Warner Inc.